Charles E. BOWLES, Jr., Plaintiff-Appellee,

v.

ZIMMER MANUFACTURING COMPANY, an Indiana corporation, Defendant-Appellant.

No. 12804.

United States Court of Appeals Seventh Circuit.

May 4, 1960.

Hugh E. Reynolds, Hugh E. Reynolds, Jr., Indianapolis, Ind., George N. Beamer, South Bend, Ind., Locke, Reynolds, Boyd & Weisell, Indianapolis, Ind., Crumpacker, May, Beamer, Levy & Searer, South Bend, Ind., of counsel, for appellant.

Thomas L. Murray, South Bend, Ind., Earl C. Opperthauser, Detroit, Mich., for appellee.

Before DUFFY and SCHNACKENBERG, Circuit Judges, and MERCER, District Judge.

SCHNACKENBERG, Circuit Judge.

Zimmer Manufacturing Company, an Indiana corporation, defendant, has appealed from a district court judgment for $45,000 and costs, for plaintiff, Charles E. Bowles, Jr., rendered upon a verdict in an action brought to recover damages claimed in count I of an amended complaint to have been occasioned by the alleged negligence of defendant in the design and manufacture of an intramedullary pin, and claimed in count II thereof to have been occasioned by a breach of warranty in the sale of said pin.

Defendant's responsive pleadings were answers, including a defense "that prior to the commencement of this action and on or about the 21st day of May, 1956, the Plaintiff was paid the sum of $9,600.-00 on account of his injuries and damage which said sum was accepted by and retained by the Plaintiff in satisfaction of the injuries suffered by him." On motion of plaintiff, the latter defense was "dismissed".

On a trial, the following material facts appeared:

On September 25, 1955, in Detroit, Michigan, plaintiff was struck by an automobile and thereby he fractured his left femur. While in the Receiving Hospital in Detroit, Michigan, for treatment, three days later, a 9 millimeter Kuntscher intramedullary pin was placed in the marrow cavity of the femur.

It was stipulated in the district court that G. A. Ingram Co. by written order to defendant, in Warsaw, Indiana, ordered the pin, which order was accepted by defendant in Warsaw, and that the pin was shipped by defendant to G. A. Ingram Co., who received it and thereupon delivered it to the Receiving Hospital.[1]

Plaintiff was allowed up on crutches, instructed not to put weight on the leg and told how to exercise it, was released three weeks after his admission and then spent a week in bed at home. After making one call to the hospital as an outpatient, he was not examined or treated there afterward. He was examined by Dr. A. Jackson Day in Detroit on November 1, 1955. On December 12, 1955, X-rays were taken by Dr. Harry Harris at Dr. Day's request. A minimum bend of less than 5 degrees at the fracture site was shown. Dr. Day advised plaintiff of this and plaintiff was as careful as he could be and continued to do his exercises and drive his car. In January 1956 he noticed further bending of the leg.

On February 3, 1956 plaintiff had pain in his leg and told Dr. Day that he slipped on the ice which compelled him to go forward on his hands with his injured leg held back up off the ground. There was then no more noticeable bending in the leg.

Plaintiff was admitted to a veterans' hospital, where the pin was straightened and later a bone graft was performed, from a chip off his hip bone. He was on crutches, and then a cane.

He was admitted to Harper Hospital in Detroit on August 14, 1957 where by operation the Kuntscher pin was removed by Dr. J. G. Reid, an orthopedic specialist, and an 11 millimeter Schneid-

---

1. An invoice in evidence indicated that G. A. Ingram Co. was located in Detroit, Michigan.

er pin was inserted. He was discharged from that hospital on August 26, 1957.

On November 20, 1957, Dr. Reid found that plaintiff's legs were the same length. There was some loss of internal rotation of the left leg. The next X-rays were taken August 21, 1958, at which time it appeared that he had a good solid bony union with a shortening of the left leg of less than ¼ inch.

It was Dr. Reid's opinion that delayed healing of the broken femur would result from a bend in such a pin, from any disturbance in proper apposition, and from the angle at the fracture site revealed by the X-ray of December 12, 1955. The delayed condition of healing in August 1957 was also caused by the bending of the pin.

It was the opinion of Doctors Reid and Day that the fracture in plaintiff's leg could reasonably have been expected to heal within six months' time from the date of the original fracture. After the bending of the pin and the very little evidence of callus revealed by the X-ray of December 12, 1955, it was Dr. Day's opinion that the union of the bone would take from nine to fifteen months.

Actually the pin continued to bend and union was not achieved until a new and different pin replaced the defective one in August 1957. It was Doctor Reid's opinion that six months after November, 1958, plaintiff could perform all of his former duties. His incapacity from the date of the insertion of the first pin to May 1959 was, therefore, 3 years 8 months. This exceeds the normal 6 month period for healing of such a fracture by 38 months.

At the time of the accident, plaintiff (28 years old at the time of the trial in 1959), was employed as a grinder in a machine shop, earning about $2 an hour.

After the pin, which was manufactured by defendant, was removed from plaintiff's leg, Dr. Reid sent it to Professor Herbert R. Lissner, at Wayne State University, Detroit. He testified that the pin in plaintiff's leg was poorly designed and that, among the defects originating in the manufacturing process, was a crack running through the entire length of the pin. Any fluctuation of the leg would cause the crack to widen. That is what happened to the pin in plaintiff's leg.

Plaintiff brought suit against the driver of the automobile that struck him and the case was settled in May 1956 by the payment of $9,600 to plaintiff. Plaintiff executed a release which contained the following specific reservations and rights:

"Anything to the contrary herein contained notwithstanding, Charles E. Bowles, Jr., reserves his rights against any and all persons, real and/or corporate who may have manufactured, sold, or used an intermedullary type nail inserted in the leg of Charles E. Bowles, Jr."

At the close of plaintiff's evidence, and again at the close of all the evidence, defendant moved the court to instruct the jury to return a verdict for defendant, upon the grounds, *inter alia,* now raised by defendant in this court. Those motions were denied.

■ 1. At the trial defendant attempted to prove the facts set up in the dismissed defense in reference to the suit brought by plaintiff against the driver of the automobile and the payment of $9,600 to plaintiff. The court having sustained an objection thereto, an offer of proof was made by defendant and rejected.

Defendant contends that the court erred, asserting that it is a universal rule of law that where one suffers an injury as a result of an accident, which is subsequently aggravated, plaintiff is entitled to only one payment for all the injuries received, irrespective of the number of parties that may be liable for the original wrong or its aggravation. He quotes from Manthei v. Heimerdinger, et al., 332 Ill.App. 335, 75 N.E.2d 132, at page 140, where the court said:

" * * * The damages he sustained are inseparable and the overwhelming weight of authority appli-

cable under these conditions is that the ancient rule of the release of one operates to release all applies indiscriminately, i. e., to both types of tort feasors, joint and independent concurring tort feasors."

The court instructed the jury in the case at bar:

"12. The Court instructs you that you may not compensate the plaintiff with damages for any prior injuries which he may have suffered by reason of any other accident or injury at some prior date.

"The plaintiff may recover, of course, for the aggravation of any prior existing injuries which he may have had at the time this injury allegedly took place, but only for the aggravation of those prior existing injuries as shown by a preponderance of the evidence, but he may not recover, as the Court has instructed you, for the prior injury.

"The plaintiff can only recover in this action for damages, if any, which you may find by a preponderance of the evidence, that he suffered as a direct and proximate result of the negligence or breach of warranty of this defendant."

The driver of the car which injured plaintiff and defendant were not joint tort-feasors. The tort of the automobile driver was committed and injured plaintiff prior to the time that the tortious action of defendant injured plaintiff. While it is true that insertion of the defective pin manufactured by defendant took place in a body theretofore injured by the negligent driver of an automobile, there was no joint action between the two tort-feasors. Their torts were separate and distinct. The injuries caused plaintiff by one tort were separate from those caused by the other tort and it is believed that the jury was sufficiently instructed on that point by the court so that it was able, from considering the evidence, to exclude from its allowance of damages assessed against defendant any damages which the plaintiff sustained by reason of the breaking of his femur.

But defendant argues in this court that, if the driver of the car and the defendant are considered to be not joint tort-feasors, then the executed instrument and payment of $9,600 constituted a full and complete release, and plaintiff can have only one satisfaction; hence he is barred from recovery in this case.

We know of no reason why plaintiff cannot rely upon the reservation of rights written into the release, which specifically preserves to plaintiff his rights against those who manufactured, sold, or used "an intermedullary type nail inserted in" his leg.

Inasmuch as this release was executed in Michigan and pertained to a Michigan tort, it must be interpreted pursuant to Michigan law. It is well settled that also on the question of damages, the law of Michigan controls, because that is where the injury to plaintiff occurred. Holtz v. Elgin, J. & E. Ry., 121 Ind.App. 175, 98 N.E.2d 245; Louisville & N. R. R. v. Revlett, 224 Ind. 313, 65 N.E.2d 731. See Waynick v. Chicago's Last Department Store, 7 Cir., 269 F.2d 322, 335; Lindsay v. Chicago, B. & Q. R. Co., 7 Cir., 226 F. 23, 26, certiorari denied 241 U.S. 678, 36 S.Ct. 727, 60 L.Ed. 1233; Anderson v. Linton, 7 Cir., 178 F.2d 304, 308; Hupp Motor Car Corp. v. Wadsworth, 6 Cir., 113 F.2d 827, 829; 76 C.J.S. Release § 39, p. 671.

In Jewell v. Welch, 117 Mich. 65, 75 N.W. 283, at page 284, the court said:

"It is the general rule that a release to one of several joint tort feasors discharges all. Under the statute (section 2283E3, 3 How.Ann. St.) the parties who contribute by sales of intoxicating liquors to an intoxication are jointly and severally liable (Franklin v. Frey, 106 Mich. 76, 63 N.W. 970; Johnson v. Johnson, 100 Mich. 326, 58 N.W. 1115); but this court has never held that, where the acts are separate and distinct, one having no connection with the other, the parties can be held jointly liable. * * *"

To the same effect is Rodgers v. Canfield, 272 Mich. 562, 262 N.W. 409.

In Meier v. Holt, 347 Mich. 430, 80 N.W.2d 207, at page 211, the chief justice, on behalf of a majority of the court, concurred in an opinion affirming four judgments obtained by injured plaintiffs against the drivers of two automobiles whose neglect was charged with causing two collisions occurring about one-half minute apart. The chief justice said, at page 211:

"* * * This is not a case in which two concurrent or successive torts combined to produce a single indivisible injury. In consequence, the rule with respect to joint or concurrent negligence causing a single injury is inapplicable. Here an initial tort, resulting in an automobile collision, caused plaintiffs injuries, of which the negligence of the first tortfeasor was the sole proximate cause, and was followed by a second tort, resulting in a second automobile collision, of which the second tortfeasor's negligence was a proximate cause, which, depending on the proofs, may or may not have caused plaintiffs additional injuries. Applicable are Frye v. City of Detroit, 256 Mich. 466, 239 N.W. 886, and DeWitt v. Gerard, 274 Mich. 299, 264 N.W. 379. I am in accord with Mr. Justice Black that we should adhere to the rule announced in those cases that the second tortfeasor is liable only for the injuries caused by his negligence.

"Undoubtedly, Allison v. Chandler, 11 Mich. 542; Gilbert v. Kennedy, 22 Mich. 117, and Story Parchment Co. v. Paterson Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, are authority for the salutary rule that plaintiff's right to recover will not be denied because of difficulty of accurately measuring his damages or ascertaining the amount thereof with certainty, that the law requires no more proof of the amount of plaintiff's damages than the nature of the case will fairly permit, and that it is enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, even though the result be only approximate, in which case it is competent for the jury or trier of the facts to form such reasonable and probable estimate of the damages as in the exercise of good sense and sound judgment they shall think will produce adequate compensation. * * *"

The district court committed no error in its rulings in reference to the settlement of $9,600 made by plaintiff with the driver of the car which injured him.

2. In this court defendant contends that error was committed in the district court by its denial of defendant's motion at the conclusion of all the evidence for a directed verdict on count II, which charged defendant with a breach of warranty in the sale of the pin.

■ This pin was the one inserted in the femur of plaintiff as part of the treatment given him while a patient in the hospital. Defendant contends that the contract of sale by defendant to G. A. Ingram Co. was an Indiana contract. The pin in question was delivered by G. A. Ingram Co. to the hospital. As a part of the treatment given to plaintiff at the hospital in Detroit, Michigan, the pin was transferred to him for a purpose for which it was made and which was undoubtedly known to defendant, G. A. Ingram Co., the hospital, the doctors, and plaintiff. The price of the pin was of course included in the hospital charges paid for plaintiff's treatment.

Both sides cite W. H. Barber Co. v. Hughes, 1945, 223 Ind. 570, 63 N.E.2d 417. At page 586 of 223 Ind., at page 423 of 63 N.E.2d, the court said:

"* * * The court will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact. * * *"

And, at page 587 of 223 Ind., at page 423 of 63 N.E.2d, the court said:

> "* * * the several courts, without consciously following a rule such as we have attempted to formulate, have considered and appraised the contact points and in the several decisions applied the law of the state with which the transaction was found to be the most closely associated."

Following these tests, we are convinced that the transaction, originating with the sending of the order by G. A. Ingram Co. from Michigan to defendant, in Indiana, and terminating in the insertion of the pin in plaintiff's leg in Michigan, was "most closely associated" with the state of Michigan. Hence we apply the law of Michigan pertaining to implied warranties in the sale of chattels.

■ From the facts alleged in count II of the amended complaint, it is evident that plaintiff seeks to recover on an implied warranty as to the fitness of the pin for the purpose for which it was sold and used. Uniform Sales Act § 15(2), Mich.Stat.Ann. § 19.255, Comp.Laws 1948, § 440.15(2). However, defendant contends that plaintiff cannot recover for breach of an implied warranty because of lack of privity of contract between the parties. There is no doubt that there are authorities supporting this contention of defendant. However, the Supreme Court of Michigan has departed from that rule in Spence v. Three Rivers Builders & Masonry Supply, Inc., 353 Mich. 120, 90 N.W.2d 873, at page 877, confessing that it had sometimes been inconstant to the "general rule", but that it was presently confronted with the question of whether it was going to continue to be hobbled by such an obsolete rule and its progeny of exceptions. The court pointed out, at page 878 of 90 N.W.2d:

> "* * * Legal confusion has inevitably resulted. Aggrieved plaintiffs have scarcely known whether to sue in deceit or fraud or for negligence or breach of warranty—or indeed whether it was worth-while to sue at all.
>
> * * * * * *
>
> "* * * We also find that in Michigan—whatever the rule may be elsewhere—there is authority for treating actions of this kind based upon implied warranty by the manufacturer as though they were explicitly grounded upon negligence."

The court, at page 879, added:

> "Again in Ebers v. General Chemical Co., 310 Mich. 261, at page 275, 17 N.W.2d 176, 181, we stated (in countenancing recovery by a remote vendee against the manufacturer of a defective insecticide for peach trees), 'Although plaintiff claims under the theory of an implied warranty, the real question is whether or not defendant was negligent.' We then proceeded to quote approvingly the language just quoted from Hertzler.
>
> "* * * We suggest in the future, however, that, where warranted by the circumstances, such declarations should sound explicitly in negligence as well as for claimed breach of warranty.
>
> "In addition we observe that the modern trend in other jurisdictions is to permit recovery by remote vendees against the manufacturer whether the action sounds in negligence or on an implied warranty or both. * * *"

At page 880, the court quoted from the 1957 supplement to 46 Am.Jur. Sales, 48:

> "'* * * The simplest way out of the difficulty would be to take the route charted by the Massachusetts court in Carter v. Yardley & Co., [319 Mass. 92, 64 N.E.2d 693, 164 A.L.R. 559] and abandon all attempts to preserve a "general rule" of nonliability which has been eaten away by exceptions. If the suit is in negligence, based on principles of tort, liability or nonliability in a particular case can be ascertained by applications of ordinary princi-

ples of tort law, without regard to notions about "privity of contract."
* * *' "

Three justices dissented from the court's opinion, the anatomy of which is as complex as its reasoning is efficacious in dispelling the confusion existing in this area of the law.

We hold that plaintiff has a right to rely upon an implied warranty of fitness in this case.

3. As to count I, charging negligence on the part of defendant, it says that the district court erred in denying its motion for a directed verdict at the close of all the evidence.

■ On such a motion, it is the duty of the court to consider the evidence in the light most favorable to plaintiff and to consider as proven facts those which the evidence tends to prove, drawing against the party requesting a directed verdict such inferences as the jury might reasonably draw from the evidence. Johnson v. Gaugh's Estate, 1955, 125 Ind. App. 510, 124 N.E.2d 704; Hammerbacher v. Babchenko, 1957, 348 Mich. 139, 82 N.W.2d 456.

We have already set forth many of the facts appearing in the evidence at the trial. In addition, we point out that there was evidence of the following facts:

After the pin manufactured by defendant was removed from plaintiff's leg, it was sent to Herbert R. Lissner, professor of engineering and mechanics at Wayne State University, Detroit, who had experience in testing prosthetic appliances. He testified that the motion of the muscles in a person's leg would tend to cause the pin to rotate to its weakest position. He made a test which determined that the maximum force which the pin could initially withstand was 107 pounds. In addition, there were three stress raisers in the pin, a sharp "V" notch, a sharp fold resembling a crack, and then a crack extending into the metal, all of which were in the pin at the time it was inserted into the bone. Forces of extremely small magnitude would cause this crack to grow to the other side, as could rolling over in bed, muscle spasms, driving a car with a clutch, and muscle spasms after a fall, such as slipping on the ice with crutches as it was described that plaintiff did. The exercises which plaintiff was told to take, as demonstrated by Dr. Reid, would cause the crack to grow. As the crack would grow, the pin would become weaker. Once the crack had progressed to the surface, a force of approximately only 53½ pounds would cause the pin to bend. The crack in the pin was caused by repeated loads, not a single force. A fall would cause deformation of a good pin, not a fracture of it. The cause of the failure, in Professor Lissner's opinion, was primarily due to the presence of the crack. The crack could have progressed through the pin by February 3, 1956 (the day extreme bending was noticed in the leg).

Nicholas M. Lozaras, a professor at the same university, corroborated this testimony. He testified that his examination revealed (a) the sharp point of the "V", (b) the middle folded on itself, and (c) a crack running through the entire length of the pin. These defects originated in the manufacturing processes.

There was much more testimony to sustain plaintiff's charge of negligence, but we find it unnecessary to extend this opinion by quoting it here.

■ We agree with defendant that the manufacturer is not an insurer of his product. He is, however, liable for the proximate result of negligence in its manufacture. We are convinced that there is sufficient evidence in the record to justify the submission of the question of defendant's negligence and plaintiff's exercise of due care, as well as the question of proximate cause, to the jury. In no respect did the district court err in denying defendant's motion at the close of all the evidence as to count I of the amended complaint.

■ 4. We have carefully considered the evidence as to the extent of damage proved by plaintiff. The verdict of the jury was not excessive.

5. Defendant contends that reversible error was committed when the district court gave the following instruction No. 5:

"You are instructed that if you find that the Kuntschner cloverleaf type intermedullary nail intended for use for fixation of a broken femur in a human being, such as is involved in this case, is by its nature such that it is reasonably certain to place life and limb in peril when negligently made, then it is a thing of danger and its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the immediate purchaser, and used without new tests, then, irrespective of any contract between the manufacturer and ultimate user, the manufacturer of this thing of danger is under a duty to make it carefully."

The language of this instruction was obviously copied from the Sixth Circuit opinion in Sitta v. American Steel & Wire Division, 6 Cir., 1958, 254 F.2d 12, 17, where the court quoted from a New York case. We are satisfied that the instruction is not subject to the criticism made by defendant.

Defendant asserts that instructions numbers 11 and 12 should not have been given by the court to the jury. He does not set forth these instructions in his brief. We have, however, ascertained from the appendix that number 11 is unobjectionable. We have set forth *ante* [277 F.2d 872] instruction number 12, in this opinion. While it is rather unfortunately worded, we feel that it properly served its purpose and was not unfair to either party.

We have examined a series of instructions tendered by defendant, numbers 1 to 14 inclusive, and find that the court did not err in refusing them.

For the foregoing reasons, the judgment of the district court is affirmed.

Affirmed.