John CULLEY, Plaintiff,

v.

The PENNSYLVANIA RAILROAD COM-
PANY, Defendant.

Civ. A. No. 2561.

United States District Court
D. Delaware.

June 28, 1965.

Andrew B. Kirkpatrick, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff.

C. W. Berl, Jr., Berl, Potter & Anderson, Wilmington, Del., for defendant.

STEEL, District Judge.

The question for decision is the damages to which plaintiff is entitled for injuries sustained in Maryland as a result of a wreck of a train negligently operated by defendant on which plaintiff was riding as a paying passenger. The liability of defendant is admitted. By agreement the case was tried to the Court.

## JURISDICTION

Plaintiff is a citizen of Delaware. Defendant is incorporated under the laws of Pennsylvania and has no principal place of business in Delaware. The amount in controversy exceeds $10,000, exclusive of interest and costs. Jurisdiction exists under 28 U.S.C. § 1332(a) (1).

## FACTUAL BACKGROUND

Plaintiff was born June 13, 1930. He graduated from high school in 1948. In 1951 he was married, and he and his wife have one child.

From the time of his high school graduation until early 1957, plaintiff worked steadily as a laborer, except while serving in the armed forces. Plaintiff entered the military in 1951, serving with a communications group laying wire and handling phone communications, and was honorably discharged in 1953 as a corporal.

In early 1957 plaintiff obtained a job as a presstender in the lithographic department of Kaumagraph Company in Wilmington, Delaware, so that he could learn a trade. A full lithographic press crew at Kaumagraph is comprised of a pressman who is the supervisor, an operator who is the next in line, and a tender who is the junior member of the crew. Some presses are operated without a full crew.

In his job as a tender, plaintiff performed numerous duties which involved a substantial amount of bending and lifting. Plaintiff was a satisfactory tender and worked steadily in that capacity until January 1960.

In January 1960 an opening occurred at Kaumagraph for an additional press operator, and plaintiff was given that job and assigned to a 25″ x 38″ two-color press. The arrangements under which plaintiff took that job called for an apprenticeship term of four years with raises in pay every calendar six months.

This was designed to bring plaintiff to the minimum rate for a journeyman operator by the time he achieved that status in January 1964.

As an operator, plaintiff was ordinarily required to perform daily tasks which required a substantial amount of bending and lifting. Plaintiff was a satisfactory operator.

Kaumagraph's lithography employees are not required to retire before they are 65 or older. The staff of press operators at Kaumagraph has been continuously employed for at least the minimum regular work week under their union contract since the early 1940s, and perhaps before, except for one strike in 1948. An operator has never been laid off by Kaumagraph during this period. There is no reason to foresee why the staff of operators will be cut back in the future. Kaumagraph generally endeavors to fill vacancies in senior positions from among persons already in its employ.

Plaintiff worked steadily as an apprentice operator until February 2, 1961. Up until that time, plaintiff had been strong and healthy, except that around 1959 or 1960 he had been treated for high blood pressure and told to lose weight. He did not do so. Neither the blood pressure or plaintiff's weight appeared to prevent him from properly performing his work at Kaumagraph.

On February 2, 1961, while plaintiff was off on a day of vacation that was due him, he was traveling as a paying passenger on a train operated by defendant. When the train was in the vicinity of Arundel, Maryland, it became derailed and a number of cars left the track.

Plaintiff was thrown forward from his seat in the rear of one of the cars and landed on his feet midway up the aisle. He was then projected backward to the area where he had been sitting and there he was thrown onto the aisle where he was pinned on his back. What appeared to be the roof of the car pressed down on plaintiff just above his chest and lower extremities. Plaintiff was bleeding at the back of his head. He called for assistance. After one person had unsuc-

cessfully attempted to free him, two other men arrived who helped him squirm forward along the aisle to an area where he was freed. He was then placed on a stretcher and passed through a window of the car and taken to a waiting ambulance. Enroute to a nearby hospital, he was in a state of shock.

At the hospital, attendants treated and dressed the wounds on plaintiff's head, left hand and legs. They gave him a shot of some kind and took x-rays. They also cleaned out what appeared to be coal dust jamming his nostrils and blew the same substance out of his ears through his throat.

After a time, plaintiff was taken to the station where he boarded a train for Wilmington. Upon arriving in Wilmington, plaintiff went to a local doctor who redressed his wounds. He was unable to sleep that night, and the next day he was so sore he could hardly move to light a cigarette.

The following day, February 3, 1961, and on several occasions thereafter during the month, plaintiff received further treatments from his family physician. After the third or fourth day, although plaintiff began to feel better, a lump appeared on his back. Ultimately, plaintiff's family physician referred him to Dr. Theodore B. Strange, a qualified orthopedic surgeon practicing in Wilmington.

Dr. Strange's first examination of plaintiff took place on February 20, 1961. He noted that plaintiff had multiple injuries consisting of contusions and some problem with his left hand. He further found that plaintiff was suffering pain in his low back and, upon bending, in his buttock. An x-ray indicated a questionable fracture of plaintiff's transverse process of the fifth lumbar vertebra.

Between February 20, 1961 and July 1961, Dr. Strange saw plaintiff at regular intervals approximately eight times, due to the fact that plaintiff had been experiencing pain in his left wrist and in his back and legs when standing very long. During this same period plaintiff went three times a week to the hospital

for physical therapy treatments to his back and left wrist.

In July 1961, plaintiff returned to work at the Kaumagraph Company. He still suffered discomfort with his back and legs, particularly after being on his feet for a while as his work required. Dr. Strange continued to see him regularly.

In the fall of 1961, after bending over at work, he was unable to arise without assistance. On November 27, 1961, Dr. Strange admitted plaintiff to the hospital with the diagnosis that he had a herniated disc. Plaintiff was in the hospital for thirteen days during which time he was in traction and given physical therapy treatments. By December 10, 1961, he seemed improved and was released with the advice that he rest for a while.

By January 10, 1962, plaintiff was permitted to return to work but was advised by Dr. Strange to do light work. As a consequence, Kaumagraph assigned to plaintiff lighter clean-up work at night which it was trying on a test basis.

Plaintiff continued to experience discomfort in his back and legs, particularly after standing for a while, and continued to see Dr. Strange. Pain in the legs such as plaintiff experienced can be produced by the herniated portion of the intervertebral disc pressing against nerve roots, causing sciatica, which in turn results in sharp pain radiating down the legs.

On May 8, 1962, plaintiff was readmitted to the hospital where Dr. Strange and an associate performed a hemilaminectomy at the L5–S1 level. There they found a herniated disc and removed such portion of it as they could. They then performed an autogenous spine fusion to immobilize plaintiff's vertebrae at the L5–S1 level. A hemilaminectomy was also performed at the level above but there the doctors found that the disc was normal.

The hemilaminectomy performed upon plaintiff was a major operation. It involved a lot of stripping away of muscle, the removal of some bone, and the tugging on nerve roots to retract them. The operation made it necessary to go in between the vertebrae. An operation of this kind is quite painful for the patient for several days following the operation. Plaintiff said that the pain was so bad he did not care whether he lived or died.

For six weeks following the operation, plaintiff laid continuously in a prone position on a hospital bed. At the end of that time he was given a brace that fitted around his trunk, and was instructed to begin gradually to try to move about.

On October 16, 1962, Dr. Strange advised plaintiff that he could begin doing light work, that he should look for some lighter work than he was doing before the accident, and that he should permanently remain in light work. Dr. Strange knew of no further treatment, operative procedure or therapy which would improve the plaintiff's condition to the point where he could do anything but light work. It is likely that plaintiff will continue to experience some discomfort for some time, and that he will be confined to light work in the future.

As a result of the advice which plaintiff received from Dr. Strange, and his physical condition, plaintiff has refrained, and it is probable that he will continue to refrain for some time, from doing the usual and familiar things of life which he was doing before his injury, and which he probably would have continued to do but for the injury; as for example, working in the garden, doing odd jobs around the house such as painting, and bowling with a team for recreation three times a week.

Since being advised that he could return to light work, plaintiff has had difficulty in finding a job that has been permanent.

From October 17, 1962 to December 31, 1964, plaintiff worked as a liquor store clerk, a bank guard, in a temporary

woman's job at Kaumagraph, and as a traffic counter for the County. The period of his employment and compensation received therefrom were as follows:

| | |
|---|---|
| Miller Road Liquor Store—$1.00 per hour | |
| May 4, 1963—4 hours | 4.00 |
| May 6, 1963—3 hours | |
| Delaware Trust Co.—$1.30 per hour | |
| Approximately May 29—July 27, 1963 | 456.95 |
| Dutch Inn Liquor Store—$1.50 per hour | |
| Nov. 25, 1963—Dec. 31, 1963 | 366.00 |
| Dutch Inn Liquor Store—$1.50 per hour | |
| Jan. 1, 1964—Sept. 19, 1964 | 2,850.00 |
| Kaumagraph Company—$1.58 per hour | |
| Sept. 22, 1964—Oct. 2, 1964 | 113.76 |
| New Castle County Land Use & Planning Group—$1.50 per hour | |
| Oct. 7, 1964—Dec. 31, 1964 | 832.50 |
| | $4,626.21 |

Plaintiff's job as a traffic counter was terminated unexpectedly on December 31, 1964.

At the time of trial in April, 1965, plaintiff had been working two days a week from 12:00 midnight until 8:00 in the morning, for about a month and a half, as a motel clerk at $1.50 per hour for the Howard Johnson Company. Plaintiff had an understanding with Howard Johnson's that after about three more weeks he would have steady employment as night clerk at $1.50 per hour.

## BASIC LEGAL PRINCIPLES

▮ When jurisdiction rests solely upon diversity of citizenship, the conflict of laws rule applied by a Federal District Court is that of the state where it sits. Stentor Elec. Mfg. Co. v. Klaxon Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under the Delaware conflict of laws rule, when an action is brought in Delaware for a tort committed in another state, the substantive rights of the parties are governed by the laws of the state where the tort occurred. Friday v. Smoot, Del., 211 A.2d 594, June 2, 1965. While no Delaware law has been found which holds that the measure of damages is a substantive right determinable by the place of the wrong, this is clearly the prevailing view. Western Union Telegraph Co. v. Brown, 234 U.S. 542, 547, 34 S.Ct. 955, 58 L.Ed. 1457 (1914); Bowles v. Zimmer Manufacturing Co., 277 F.2d 868, 872, 76 A.L.R.2d 120 (7th Cir. 1960); Smyth Sales v. Petroleum Heat & Power Co., 128 F.2d 697 (3rd Cir. 1942); Goodrich, Conflict of Laws 159 (4th Ed. 1964); 25 C.J.S. Damages § 4. Delaware would probably follow this view, if the question should arise.

▮ Since plaintiff's injuries occurred in Maryland, the damages recoverable by plaintiff are governed by Maryland law.

▮▮ Under the laws of Maryland a person who has been personally injured by the tort of another is entitled to recover such damages as will be fair and just compensation for his injuries, losses and expenses, including, as elements thereof, medical expenses, an amount for pain and suffering, loss of earnings, in each instance past and future, Rhone v. Fisher, 224 Md. 223, 167 A.2d 773, 775 (1961),[1] and an amount for past and

1. Although some Maryland authorities speak conceptually in terms of "impairment of future earning capacity", they recognize that a comparison of the earn

future loss of enjoyment of the usual or familiar things of life, McAlister v. Carl, 233 Md. 446, 197 A.2d 140, 146 (1964).

■■ There is no exact measure for pain and suffering. The law only requires that damages attributable thereto be fair to both parties. McAlister v. Carl, supra, 197 A.2d at 142. Any damage for past or future deprivation of enjoyment of usual activities is intangible, just as is damage for pain and suffering, and it would appear to be subject to the same standard of measurement, i. e. any award therefor must be fair to both parties. See McAlister v. Carl, supra, 197 A.2d at 145. The award for pain and suffering may, but need not be, considered on a "per diem" basis. Eastern Shore Public Service Co. v. Corbett, 227 Md. 411, 177 A.2d 701, 710–711, aff'd on rearg., 180 A.2d 681 (1962).

■ Recovery of damages based upon the future consequences of a tort may be had only if they "may certainly or reasonably and probably result therefrom as proximate consequences", but damages for future consequences which are speculative or conjectural are not recoverable. Adams v. Benson, 208 Md. 261, 117 A.2d 881, 885 (Ct. of App.Md.1955).

■ Damages which are based upon earnings must be awarded without consideration of the impact of income taxes. See Rhone v. Fisher, supra, 167 A.2d at 775, where the "standard instruction" is set forth. Query, concerning the significance of the income tax discussion in Jennings v. United States, 178 F.Supp. 516, 532–533, (D.Md.1959), vacated and remanded, 291 F.2d 880, 888 (4th Cir. 1961), reinstated, 207 F.Supp. 143 (D. Md.1962), aff'd, 318 F.2d 718 (4th Cir. 1963), where "pecuniary loss" to survivors under the Maryland Wrongful Death Act was the yardstick, rather than "loss of earnings" in a common law personal injury action. Rhone v. Fisher, supra.

ings at the time of injury with those capable of and actually being earned after the injury is the best gauge of impairment. See Fleishman Transport Co. v. Egli, 163 Md. 663, 164 A. 228, 229 (1933).

## MEDICAL EXPENSES

Defendant agrees that plaintiff is entitled to recover $25.00 for x-ray expense, and it will be awarded to him.

## PAST AND FUTURE PAIN AND SUFFERING AND LOSS OF THE USUAL AND FAMILIAR THINGS OF LIFE.

■ It is fair and just to award plaintiff the amount of $12,000 for the pain and suffering which he experienced as a result of his injury up to the time of the trial and for the pain and suffering which he will probably experience thereafter, and to compensate him for his past and future loss of enjoyment of the usual or familiar things of life.

## LOSS OF PAST EARNINGS

■ If plaintiff had been able to work regularly from January 1, 1961[2] through December 31, 1964 as a two-color press operator at Kaumagraph, which he probably would have been able to do but for his injury, he would have earned a total of $26,292.83. During this same period, he actually earned $9,852.59 ($5,340.14 at Kaumagraph and $4,512.45 from other sources). The difference is approximately $16,440. Defendant concedes that during this period plaintiff experienced a loss of earnings of $16,012 due to his injury. This is $428 less than the amount claimed by plaintiff.

Defendant points out that Dr. Strange testified that on June 5, 1961 he told plaintiff that he could go back to work on a trial basis, but that plaintiff did not report to work until July 10. Since plaintiff has failed to explain this inactivity of a month or so defendant argues that the compensation of $428 which is allegedly attributable to that month, should be disallowed.

If paragraph (C)4 of the pretrial order can be interpreted to require the inclusion of pay for the period June 6, 1961

2. The period from January 1, 1961 to February 2, 1961, is not relevant since it is before the date of the accident but it has been included, without objection, for ease in computation.

to July 9, 1961, as plaintiff argues it should be, then in the interest of justice the order should be deemed to be modified so as to permit its exclusion.

It is fair and just to award plaintiff the amount of $16,440 less $446 (this is the correct amount attributable to the unworked month of June 1961, rather than $428 as calculated by defendant) or $15,994 for earnings which he lost between February 2, 1961 and August 31, 1964.

### LOSS OF FUTURE EARNINGS

Plaintiff has presented four alternative methods for calculating his claimed loss of future earnings. Subject to variations in assumptions as to wages and benefits to be received in the future by plaintiff, each is based upon the same fundamental approach, i. e. that plaintiff is entitled to recover the difference between what he probably would have earned if he had worked as a two-color press operator at Kaumagraph from January 1, 1965 to June 30, 1995, and what he will probably earn during the same period if he is employed in light work of the general type which he has been doing since his injury, with the difference reduced to present worth by the application of a discount factor of 3½% to the amounts to be received weekly in the future.[3] This approach to the problem of loss of future earnings is a proper one to follow.

If plaintiff had worked at Kaumagraph as an automatic operator of a two-color press from January 1, 1965 until he was 65 years old, he would have been paid under the current union contract a base straight time rate of $3.35 per hour from January 1, 1965 to June 30, 1965, and $3.47 per hour from July 1, 1965 to June 30, 1966, and he would also have received the benefit of welfare payments of $5.00 per week from January 1, 1965 to June 30, 1965 and $5.35 per week from July 1, 1965 to June 30, 1966.

Dr. Charles N. Lanier, a qualified labor management economist, testified as to what, in his opinion, the likely future benefits on such job would be, based upon relevant historical data concerning earning levels in general and, in particular, upon the history of more than fifteen years that was available concerning operators at Kaumagraph. The mean of his estimated base straight time wage rate projections gradually increase from $3.63 per hour effective July 1, 1966 to $9.12 per hour effective July 1, 1994. This reflects the following estimated annual average rate of increase of base rates:

| | Low | High |
|---|---|---|
| 1964–69 | 4.3% | 4.8% |
| 1969–74 | 3.8% | 4.3% |
| 1974–79 | 3.5% | 3.8% |
| 1979–84 | 3.2% | 3.5% |
| 1984–89 | 3.0% | 3.2% |
| 1989–94 | 3.0% | 3.2% |

Dr. Lanier also estimated that effective July 1, 1966 the welfare benefits would be $5.50 per week, and that these would gradually increase until they reached $10.00 per week effective July 1, 1994.

If plaintiff worked as an automatic operator of a two-color press at Kaumagraph during the period January 1, 1965 to June 30, 1995 for the average number of hours that those holding such jobs had

---

3. Defendant denies that there is any evidentiary basis upon which to award damages for loss of future earnings. Both parties agree, however, that if any such loss be established, it must be reduced to present worth, and that a discount factor of 3½% is a proper one to apply.

worked during the five years preceding the trial, and if plaintiff had been paid under the present union contract until June 30, 1966, and thereafter he had received the mean of the increased hourly pay rates and the welfare benefits projected by Dr. Lanier, he would have received a total amount of $414,418.27.

Dr. Lanier further testified that earnings in the light type of employment at which plaintiff was required to work because of his injury could not be expected to grow at a rate faster than he had predicted for the Kaumagraph operators. By applying the mean rate of increase projected for the Kaumagraph operators, to the $1.50 per hour which plaintiff was receiving at the time of trial, a projected wage rate for the light type of work comes to a rate of $1.57 per hour for the twelve-month period ending June 30, 1967 with gradual increases until $4.05 per hour is reached for the twelve month period ending June 30, 1995.

If during the period January 1, 1965 through June 30, 1995, plaintiff performed light work such as he had been doing since his injury, for the average number of hours that operators of two-color presses had worked at Kaumagraph during the five years preceding the trial, and if plaintiff was paid at the rate of $1.50 per hour, increased through the period by the mean of the percentage projected by Dr. Lanier for the rates at Kaumagraph, he would have received $153,871.82. This is $260,546.45 less than the $414,418.27 plaintiff would have received at Kaumagraph under the assumptions previously stated.

The present worth of $260,546.45 at the time of trial (April 1965),[4] determined by applying a 3½% discount to the payments which would have been received weekly, is $148,359.80.

It seems more reasonable to assume that wages and welfare benefits will increase in the manner projected by Dr. Lanier than to assume that they will remain static over the next thirty years,

as is assumed by plaintiff in an alternative theory which he has advanced. However, if during that period a two-color press operator at Kaumagraph continued to receive wages and benefits called for by the present union contract, and a person employed in light work such as plaintiff has been performing since his injury continued to receive $1.50 per hour, plaintiff's present rate of pay, and in each instance he worked the average number of hours that those holding positions as press operators at Kaumagraph had worked during the five years preceding the trial, then the gross differential in favor of the Kaumagraph job would be $152,448.30. Discounted at 3½%, its present worth is $94,325.37.

The two other theories of computing loss of future earnings which plaintiff has suggested appear to be less acceptable than either of the two heretofore discussed.

The theory that plaintiff is entitled to $148,359.80 for loss of future earnings is based upon a number of hypotheses, i. e. that (1) plaintiff will live at least until he is 65; (2) but for his injury, plaintiff would have worked at Kaumagraph as an operator of a two-color press until he was at least 65 for the same number of average hours as were worked by two-color press operators at Kaumagraph for the five years prior to the trial; (3) the wage scale and benefits projected by Dr. Lanier will be in effect at Kaumagraph for operators of two-color presses from July 1, 1966 to June 30, 1995, and (4) plaintiff will never be able to earn, during the next 30 years, more than $1.50 per hour plus percentage increases like those which Dr. Lanier predicted for two-color press operators at Kaumagraph.

Obviously, none of these hypotheses are certainties. At best, they are only probabilities; and the future may demonstrate the unreliability of at least some of them.

The assumption that, but for his injury, plaintiff would have retained his job at Kaumagraph until he is 65, de-

---

4. Actually, the computation in the interest of simplicity was made to January 1, 1965.

pends upon many contingencies. While plaintiff has a stipulated life expectancy of 75 years, there is no assurance that he will achieve that age, or indeed any other. A life expectancy is a guide, not a formula which a judge or jury is compelled to apply. O'Toole v. United States, 242 F.2d 308, 309 (3rd Cir. 1957); Snyder v. United States, 118 F.Supp. 585, 593 (D.Md.1953).

 A man's life expectancy is not his work expectancy. Although plaintiff might live until he is 65 or older, a disabling accident or illness could have occurred in the interim that would prevent him from retaining his Kaumagraph job. It is a matter of common knowledge that unions are continually pressing to expand employment benefits for their membership, and with automation assuming increasing importance, it is not unrealistic to envisage that within the next 30 years compulsory retirement before 65 may be the order of the day.

On the other hand, the possibility that plaintiff may at some time recover his old job at Kaumagraph, or secure an equally good job in some trade, is a possibility that cannot be disregarded. Dr. King examined plaintiff before and after the operation and found the fusion of his spine was satisfactory. He stated that although the fusion resulted in 25% loss of function, the restriction of motion would not prevent plaintiff from lifting or performing his former work. He stated that frequently athletes who have the operation are able to carry on, and that he has seen persons after such an operation go back to their previous job such as a construction worker, airplane mechanic, or an assembly line worker, involving strenuous physical activities.

Dr. King stated that if plaintiff had been his patient he would have put him on a graded, progressive rehabilitation program to increase his exercise tolerance, and then observe him to determine if he could carry on his former work. If

he felt plaintiff could, Dr. King said that he would tell him to try it temporarily under careful observation. He stated that this process might take six months before a decision could be reached, and that some men have been able to go back to heavy work after going through the rehabilitation process, although others have not.

Plaintiff was in Court when Dr. King testified. It is not far fetched to recognize the possibility that plaintiff may decide to follow Dr. King's method of treatment. If he does, and the treatment proves successful, as Dr. King said that it had in some instances, plaintiff could well end up at his old job, or at other employment equally remunerative which demands comparable physical maneuvering and trade skills.

Furthermore, prior to his injury, plaintiff had never been faced with the necessity of doing anything other than working as a skilled laborer. Now, confronted with a drastic curtailment of his income, he has expressed an ambition to obtain a salaried job instead of one which pays him only a wage. True, none is on his immediate horizon, but when he took his present job he was told by his employer, Howard Johnson, that he had a good future, if he did all right. It is entirely possible that, in some white collar capacity working either for Howard Johnson or someone else, plaintiff will ultimately earn substantially more than his present $1.50 per hour, with upward adjustments based upon the testimony of Dr. Lanier.

So far as Dr. Lanier's 30 year projection is concerned, he candidly admitted the difficulty of making such a forecast with accuracy, and stated that predicting the future upon the basis of the past history was "about as good as one can do."

Considerations such as these would have been appropriate for a jury to take into account in assessing plaintiff's loss of future profits.[5] By the same token, a

---

5. "[J]uries do not usually award the full amount that the earning power × expectancy—discount formula would de-

mand. See Kalven [The Jury, the Law and the Personal Injury Damage Award, 19 Ohio St.L.J. 158, 159 (1958)]". Mc-

Court is entitled to evaluate them, having in mind the inevitable uncertainties in making a thirty year forecast. See National Airlines, Inc. v. Stiles, 268 F.2d 400, 404 (5th Cir.), cert. denied, 361 U. S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959). Noel v. United Aircraft Corp., 342 F.2d 232, 239 (3rd Cir. 1964) is not inconsistent with such an evaluation.

The imponderables alluded to demonstrate that the underlying factual assumptions upon which plaintiff's claim rests are, at best, nothing more than probabilities themselves, whose likelihood of occurrence cannot be fixed with any degree of precision. This, of necessity, reduces the ultimate probability that the loss of future earnings will be of the magnitude of $148,359.80 which plaintiff claims under what appears to be his most plausible theory. In these circumstances, the figure must be substantially reduced if a fair and just award is to be rendered.

While no precise formula for determining such an award can be laid down, the task of the Court, as a fact finder, is to do what any jury would do, i. e. examine all the evidence, consider and weigh it, and arrive at the best figure that it can in making the damage award. O'Toole v. United States, 140 F.Supp. 672, 682 (D.Del.1956), rev'd on other grounds in O'Toole v. United States, 242 F.2d 308 (3rd Cir. 1957). This is implicitly recognized in those court-tried cases in which a lump sum damage judgment has been rendered either without a breakdown of the damage elements or an explanation of the manner in which the amount of the judgment has been arrived at. Henderson v. United States, 328 F.2d 502 (5th Cir. 1964); Dwyer v. Socony-Vacuum Oil Company, 276 F.2d 653 (2nd Cir. 1960); Robey v. Sun Record Co., 242 F.2d 684 (5th Cir.), cert. denied, 355 U.S. 816, 78 S.Ct. 20, 2 L.Ed.2d 33 (1957); United States v. Pendergrast, 241 F.2d 687, 689 (4th Cir. 1957); Allen v. Union Barge Line Corporation, 239 F.Supp. 1004 (E. D.La.1965); Sanders v. Leech, 64 F.

Supp. 600 (N.D.Fla.), aff'd 158 F.2d 486 (5th Cir. 1946). But see Moore-Mc-Cormick Lines, Inc. v. Richardson, 295 F.2d 583, 96 A.L.R.2d 1085 (2nd Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962).

With the foregoing considerations in mind, the Court has concluded that an award of $90,000 for the loss of future earnings will be fair and just.

### CONCLUSIONS

A judgment in favor of plaintiff against defendant will be entered in the amount of $118,019.

The foregoing opinion embodies the Findings of Fact and Conclusions of Law which are required by F.R.Civ.P. 52(a).

Weeney v. New York, N. H. & H. R. R. Co., 282 F.2d 34, 38, Fn. 10 (2nd Cir.),

cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960).