**PICKER X-RAY CORPORATION,**
Appellant,

v.

Helena FRERKER and Helena Frerker, Executrix of Last Will of Leo B. Frerker, Deceased, Appellees.

No. 19010.

United States Court of Appeals
Eighth Circuit.

Jan. 30, 1969.

Morton K. Lange, of Robertson, DeVoto & Wieland, St. Louis, Mo., for appellant; L. A. Robertson, on the brief.

Rexford H. Caruthers, St. Louis, Mo., for appellees.

Before VAN OOSTERHOUT, Chief Judge, BLACKMUN, Circuit Judge, and VAN PELT, District Judge.

VAN PELT, District Judge.

This is an action for damages, which was originally filed in the state courts of St. Louis and was thereafter removed to the United States District Court for the Eastern District of Missouri. Diversity jurisdiction exists.

The action arises from a medical procedure on Helena Frerker, one of the plaintiffs, in which a Kifa guide wire was inserted into her body. When the guide wire was removed it was found that the tip had broken off. A subsequent surgical operation to remove the tip was necessary. Expense and damage resulted. The original plaintiffs were Mrs. Frerker and her husband. He died prior to trial and Mrs. Frerker as executrix was substituted as a party plaintiff in his stead.

Defendant is a St. Louis wholesaler and distributor of such guide wires. Plaintiffs claim that the defendant furnished Washington University, whose personnel conducted the medical procedure, the wire which was used. The complaint charged breach of an implied warranty of fitness and reasonable safety of such a wire.

The case was tried to a jury and verdicts were returned for each plaintiff.

The errors assigned relate to the insufficiency of the evidence; error in instructions; error in the receipt of two exhibits; and the claim that the verdict was the result of passion and prejudice.

A detailed statement of the evidence is unnecessary. It will be limited to the facts relevant to the discussed errors.

Mrs. Frerker entered Barnes Hospital in St. Louis for a radiological procedure. Personnel of Mallinckrodt Institute of Radiology at Washington University, St. Louis, conducted these procedures. On May 6, 1965, Dr. Koehler, a radiologist, who was in charge of the section of abdominal roentgenology for the Institute, performed a Graham dye test or a venogram on Mrs. Frerker. In the course of the procedure a catheter is advanced by means of the guide wire into the location desired in the vessel. When the catheter is in position, the guide wire is then removed. In the procedure on plaintiff a part of the guide wire, described as the flexible tip, broke off and remained in plaintiff. This was discovered when the guide wire was withdrawn.

Dr. Koehler concluded to complete the test and did so. Mrs. Frerker was then removed to St. John's Hospital in St. Louis where the same day by surgery this tip was removed.

The guide wire used in the procedure on plaintiff was known to the radiologists as a "large one." Depending on where it was measured, its outside diameter was from .0526 to .0527 of an inch. The tolerance of Kifa wires was from 52 to 54½. Converted to inches, this meant a diameter of from 52 thousandths to 54.5 thousandths. Thus the wire used on Mrs. Frerker fell within this tolerance.

Exhibits 3A and 3B were the pieces of guide wire used in Mrs. Frerker's procedure. According to Dr. Koehler they were of the same type and same caliber as a genuine Kifa wire which was in evidence as Exhibit 5. He testified that with the size of the needle used

on Mrs. Frerker's body he only used Kifa guide wire and testified to the conclusion that the tip of the Kifa guide wire broke off and lodged in her vein. He further stated that he never used any other type of guide wire in the period through May 6, 1965 than a Kifa guide wire.

The record shows that between March 19, 1963 and April 23, 1963 the University purchased one B & D guide wire manufactured by Becton-Dickinson of the size .054. From Exhibit H it could be concluded, as urged by plaintiff, that this wire was purchased for the use of Dr. Marrin Friedenberg. The small Becton-Dickinson wires had an outside diameter of .036. Dr. Koehler thought that the Institute had on hand in the part where he worked on May 5 and 6 only the large Kifa wires and the small B & D wires.

It seems certain that guide wires were used more than once by the examining physician. Defendant claims that during the period of the purchase of the not to exceed 32 Kifa wires from it that based on the number of examinations testified to by Dr. Koehler guide wires would have been used on from 660 to 990 occasions.

The record contains evidence of the purchase of not to exceed 32 Kifa wires from the defendant during a period of several months prior to May, 1965. It also appears that 18 of these were returned for a reason not shown. There is no evidence from which it could be inferred if the wire was a Kifa wire that it was purchased from anyone other than the defendant.

Each guide wire is delivered in a separate envelope. The envelope shows the make of the wire. Dr. Koehler testified that he didn't have anything to do with removing the wires from the package or the marking of the cloths before they were sterilized. He testified that the wire is removed from the original package before it is sterilized and that it is wrapped in a towel, labeled, and then

put in a sterilizer, and thereafter sent up to his department for use. He testified that they can keep them sterile a couple of days so that they always have a supply of them on hand. The guide wires are left in the sterilized cloth until the last minute before use. After removal from the cloth there is no means of identification of the wire used. Dr. Koehler testified that the wire which broke in Mrs. Frerker's body appeared "new, or almost new" and "this wire didn't have any bends."

In addition to this evidence, there was received in evidence three exhibits dealing with the incident, being Exhibits 8, 8A and 12, hereafter discussed in greater detail.

■ The foregoing, when read with the three exhibits mentioned, is the substance of the testimony as it related to whether a Kifa wire was used in the procedure on Mrs. Frerker and whether the wire used was purchased from defendant. If the wire used was a Kifa, then it is a reasonable deduction that it was sold by defendant. There is no evidence of the purchase of Kifa wires during this period from any other supplier. The burden of establishing that it was a wire purchased from defendant, was on plaintiff. It is defendant's claim that this evidence is insufficient. Because of our ruling upon Exhibits 8A and 12, we do not need to reach this claim which is affected by whether the contents of these two exhibits can be considered.

Likewise, we do not need to pass on the claimed error that the court omitted in its charge as an essential element of plaintiff's case to be proven by a preponderance of the evidence that the guide wire was defective when it left defendant's control. It is clear that this was an essential allegation. If the case is retried, this can be corrected. Doubtless a charge is clearer to laymen if all essential allegations to be proven by a plaintiff or by a defendant are set forth in consecutive order. We are not saying that reading the charge as a whole the jury was misled as to this issue or that

it was not later included in another part of the charge, but believe that it is a claimed error that need not arise on a retrial.

■■ We should observe that counsel are not in dispute as to the law of implied warranty applicable to the case. It is basic that there is an implied warranty of fitness for the purpose for which the wire was offered for sale and an implied warranty of quality. While most of the reported cases for breach of the implied warranty are against the manufacturer, a distributor or supplier is liable as well for breach of an implied warranty.

■ Privity is no longer required in most jurisdictions and is not required in Missouri. We hold here that plaintiff, a patient, has a right to rely on the implied warranty of fitness and that she and her husband, if damaged, can recover for a breach of such a warranty. A case closely in point is Bowles v. Zimmer Manufacturing Co., 277 F.2d 868, 76 A. L.R.2d 120 (7 Cir. 1960). It involved a defective intermedullary pin inserted in the narrow cavity of the plaintiff's femur. One count was based upon "an implied warranty as to the fitness of the pin for the purpose for which it was sold and used." The court said, following a discussion of the issue of privity:

"We hold that plaintiff has a right to rely upon an implied warranty of fitness in this case." (875)

We turn to the claim of error in admitting in evidence Exhibits 8A and 12. It is claimed not only that the receipt in evidence of each of these exhibits was error, but it is claimed additionally that the trial court's remark that "defendant will have an opportunity if he so desires to subpoena any of the witnesses down here" made in the jury's presence, helped to bring about a verdict which was the result of passion and prejudice.

At least one of the persons mentioned in Exhibit 12 was beyond the subpoena power of the court. The court's remark was thus factually incorrect. We do not

reach the question of whether the remark contributed to the passion and prejudice which defendant claims produced a verdict of the size of this verdict for the limited injuries sustained.

Exhibit 8 was an incident report made by Dr. Koehler following the procedure on Mrs. Frerker. It was prepared following the incident. It was received in evidence without objection.

It reads:

### MALLINCKRODT INSTITUTE
### INCIDENT REPORT

DATE   May 6, 1965

NAME   HELENA FRERKER
ORIGIN   OUTPATIENT
ADDRESS   910 11th Street
CITY   Carlyle
STATE   Illinois
TIME OF INCIDENT   9:00–10:00 AM
PLACE OF INCIDENT   Special Procedure Room
Third Floor Radiology
DESCRIPTION OF ACCIDENT (by injured person or witness): During placement of TSP-45 Teflon Catheter in right pelvic vein, flexible tip of the Kifa Guide Wire # 17.130–120 broke off the Guide and lodged in the patient's vein. No resistance was met upon insertion or retraction of the guide. When it was noted that the tip was missing, immediate fluoroscopy of the patient indicated the location of the tip in the patient.
REPORT OF EXAMINING PHYSICIAN:
X-RAY REPORT: Copy of x-ray report is attached. NOTE: according to Dr. A. I. Auer, who removed the tip by surgical procedure, the guide wire tip was wholly within the vein of the patient.
TREATMENT: Patient's physician, Dr. A. I. Auer, was notified and he took the patient to St. Johns Mercy Hospital where he removed the guide wire tip by surgical procedure.
DISPOSITION: NOTE: Guide wire is believed to be defective. Parts are being retained for investigation. According to Dr. Auer, the tip broke a second time when he was handling it after the removal of the tip from the patient's vein.
REFERRING PHYSICIAN NOTIFIED AT: 10:00 AM—Physicians'
Exchange                                                                                    Time
HOSPITAL DIRECTOR NOTIFIED AT: Not applicable        Time

P. Ruben Koehler
Signed (Radiologist)

Mary A. Chapman
Witness

———◆———

Exhibit 12 is a supplement to the incident report. It was made by Mr. William R. Brown, University business manager, in the afternoon after Exhibit 8 had come to his attention. He talked to Nurse Chapman, who signed Exhibit 8

as a witness, and he called Dr. Auer at St. John's Hospital, where Dr. Auer had removed the broken tip from the vein of Mrs. Frerker. He then prepared Exhibit 12 at a time probably four or more hours after the incident.

Exhibit 12 reads:

"MALLINCKRODT INSTITUTE OF RADIOLOGY

"Addendum to Incident Report May 6, 1965 Patient: Helena Frerker

According to Mary Chapman, Registered Nurse, she flexed the spring tip end of the guide and pulled slightly on same to check for defects. Also, she measured the length of the guide wire against the teflon catheter which was to be used. Mary Martin, X-ray Technician, saw Mrs. Chapman flex the guide tip.

Dr. Koehler, also, checked the guide and catheter for length and size.

Nothing out the ordinary was noted during these routine checks of the equipment.

This guide, it is believed, had not been used on a patient prior to this examination.

Address of Mrs. Chapman after 6/1/65:

Mrs. Charles B. M. Chapman (Mary)

Medical School
University of New Mexico

Albuquerque, New Mexico

Notified by phone 2:00 PM, May 6, 1965:

Wm. Stansfield, W. U. Purchasing Dept. (Insurance)

Richard Bull, Attorney for W. U. (at request of Mr. Stansfield)

Ralph Borgmann—The Medical Protective Co."

Exhibit 8A is a letter written by Mr. Brown four days after the incident. It reads:

"Inter-Departmental Letter
WASHINGTON UNIVERSITY
Saint Louis

"May 10, 1965.
From RADIOLOGY
          Department

Mr. William Stansfield
Purchasing Dept., Main Campus

Dear Mr. Stansfield:

Attached are the Incident Report, X-ray Report, and an Addendum to the Incident Report with regard to Patient Helena Frerker. Details of this incident which occurred on May 6, 1965, were given to you by telephone that day.

The guide wire in question was manufactured by the Elema-Schonander Equipment Co. in Stockholm, Sweden. It was purchased from Picker X-ray Company at St. Louis, who obtained it from the Schick Corporation, Chicago, Illinois. Picker X-ray Co.'s representative, F. C. Schneeberger, has been orally informed of the incident. He indicated that he would call the Schick office to apprise them of the incident.

Yours very truly,
(Signed) William R. Brown

WILLIAM R. BROWN, Business Manager

cc: Mr. Richard Bull, Attorney at Law

Mr. Ralph Borgmann, The Medical Protective Co."

Objection was made to Exhibits 12 and 8A as being hearsay, denying the right to defendant to cross-examine, lack of proper foundation for admission, and incompetency. In considering this objection, the court made the observation above set forth concerning the subpoenaing of the witnesses. Plaintiff's counsel in the discussion which ensued concerning the admissibility of each exhibit, urged the admission of each exhibit as a part of the res gestae and as being a business record. We shall examine each of these grounds separately.

■■ We meet first the claim of res gestae. Cases involving statements received or urged for admission as "res gestae" are legion. Statements made at the time of an act though not precisely concurrent in point of time have been regarded, because of their spontaneity, as inherently credible and thus admissible in evidence. They must be near enough in time to the event to preclude the idea of deliberation or fabrication and to exclude the presumption that they are the result of premeditation or design. It has been said that to be a part of the res gestae the statement must be the event speaking for itself through the instinctive words of the speaker, rather than words of a speaker narrating an event. The words must be that of a person who has just participated in or closely witnessed the incident. Seldom, if ever, can the statement be that of a narrator who did not witness or participate in the incident.

■ Here we have statements written by a business manager of a hospital relating to an incident occurring in the hospital. One statement was made at least four hours after the incident; the other four days after the incident. That he knew the incident could result in a lawsuit is certain from the fact that he notified the University's attorney and its insurance carrier. Thus the statements have none of the usual safeguards of a res gestae statement and clearly were inadmissible under the res gestae theory advanced by counsel.

Are they admissible under the business records acts? Title 28 U.S.C.A. § 1732, relative to records made in the regular course of business was not complied with fully in that counsel did not by specific question show both that the exhibits were made (1) in the regular course of business, and (2) that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, • occurrence, or event or within a reasonable time thereafter. From the general testimony of the business manager, however, such facts are reasonably to be inferred and we would not reverse for this lack of foundational questions.

■ It is clear that both exhibits contain hearsay. Most business records admitted under § 1732, or similar statutes, do. One of the purposes of such statutes is to provide an exception to the hearsay rule.

■ It is clear that such records are not free from selfish motive of the preparer. Again, many business records are subject to this complaint. No better example is needed than the book entries of the grocer as to the groceries delivered to the housewife yet that in itself does not prevent reception of the grocer's books in evidence. Hospital records made by a nurse conceivably could be colored by her desire to show that she was "on the job." A jury can evaluate such self interest and motive. Courts in the search for justice have long permitted certain hospital records and entries to be received in evidence, believing that entries relied on by doctors and nurses in matters concerning the life, death and treatment of patients should be relied on by the courts sufficiently at least to let them be read, examined and weighed by a jury in its determination of ' issues on which they have a bearing.

Here we have records which are hospital records and which qualify as business records [1] but have no relationship to future treatment of the particular patient, Mrs. Frerker. True, as a result of incident reports medical procedures may be changed and future patients may receive different treatment. However, Mrs. Frerker's treatment in no way depended on either exhibit. She had left the hospital, probably, before the business manager heard of the incident. These records thus do not have the guarantee, if ever it is such, of credibility afforded by reliance thereon by doc-

1. Hermann v. St. Louis Public Service Co., Mo.App., 345 S.W.2d 399, 405 (1961); Allen v. St. Louis Public Service Co., 365 Mo. 677, 285 S.W.2d 663, 55 A.L.R.2d 1022 (1956).

tors and nurses in matters affecting the life and death of the patient.

We have in these exhibits and especially Exhibit 12, the statements of third parties, one a nurse at the hospital, who notwithstanding the court's statement in the presence of the jury that she could be examined as a witness could not be so examined, as to the condition of the guide wire at the time of its use on Mrs. Frerker, and a general conclusion, whether of Mr. Brown or someone else, that nothing out of the ordinary was noted during these routine checks of the equipment and the conclusion of someone unnamed on a matter at issue, namely, whether the wire was a reused wire.

Exhibit 8A contains a statement as to the name of the manufacturer of the wire. Exhibit 8 states that it was a Kifa guide wire. Thus the statement of the manufacturer's name in Exhibit 8A is cumulative and would not require a reversal if it was the only objectionable statement in the exhibit. However, the references at the bottom of Exhibit 8A to "The Medical Protective Co." when taken with similar references at the bottom of Exhibit 12, including the word "Insurance" help us to conclude that neither exhibit should have been received in evidence.

We conclude that the objection made to these two exhibits should have been sustained, and that their receipt in evidence requires a new trial.

We conclude, in so holding, that it is unnecessary to discuss the cases of Skogen v. Dow Chemical Company, 375 F.2d 692 (8 Cir. 1967); Glawe v. Rulon, 284 F.2d 495 (8 Cir. 1960) and Harris v. Smith, 372 F.2d 806 (8 Cir. 1967), or determine the portion of hospital records admissible in evidence as business records.

The Missouri rule [2] does not seem to be as broad a rule of admission as *Glawe* and *Harris*, supra, and yet may be broader than *Skogen*, supra. Specific reference is made in the Missouri cases

to certain objections to hospital records such as "* * * irrelevancy, inadequate sources of information, as being self-serving, as going beyond the bounds of legitimate expert opinion, or on similar substantive grounds. * * *" and mention is made of the portions of hospital records which are receivable: "* * * the patient's symptoms and complaints, treatment and progress records, diagnoses by those qualified to make them, the results of analyses and laboratory tests, X-rays, the behavior of the patient, and those parts of the patient's history inherently necessary (or at least helpful) to the observation, diagnosis and treatment of the patient."

We discuss the Missouri rule because under Rule 43(a), Federal Rules of Civil Procedure, if the exhibits are admissible under either the federal rules of evidence or under Missouri evidence law, the trial court should be affirmed.

The Missouri court in Kitchen v. Wilson, Mo., 335 S.W.2d 38 cites Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719, with approval.

Palmer involved an engineer's statement made two days after the accident. It was offered as a business record. The Supreme Court held it was properly excluded and said, among other things:

"But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act. If it did, then any law office in the land could follow the same course, since business as defined in the Act includes the professions. We would then have a real perversion of a rule designed to facilitate admission of records which experience has shown to be quite trustworthy. Any business by installing a regular system for recording and preserving its version of accidents for which it was potentially liable could qualify

2. Hermann v. St. Louis Public Service Co., Mo.App., 345 S.W.2d 399, 405 (1961); Allen v. St. Louis Public Service Co., 365 Mo. 677, 285 S.W.2d 663, 55 A.L.R.2d 1022 (1956).

those reports under the Act." (113, 63 S.Ct. 480)

It is also difficult to reconcile the admission of these statements with the prior teachings of this court as to statement taking and the admissibility of ex parte statements so well discussed by Judge Lay speaking for this court in Goings v. United States, 377 F.2d 753, and by Judge Register in United States v. Rainwater, 283 F.2d 386.

The trial court's reference to cross-examination of the person whose statement is contained in Exhibit 12 is contrary to the teaching of these two cases.

While Wigmore, The Model Code and the Uniform Code of Evidence have all proposed receiving hearsay declarations if the declarant is available for cross-examination, the Court of Appeals for this Circuit has long taken the contrary view, which Wigmore says "is the orthodox one." Here, as earlier mentioned, one declarant was not available for cross-examination.

We hold that these two exhibits are not such business records of the hospital as are properly admissible in evidence under the holding of *Palmer*, supra, or of the cases in this circuit or in Missouri.

We believe that incident reports, a requirement in many hospitals, are proper. This opinion, therefore, is not a condemnation of such reports or of the interest of the business manager in recording what happens in the hospital. We feel, however, that the statute under which hospital records, including incident reports, are sometimes received in evidence as business records, was never intended to include ex parte statements gathered under the circumstances and for the purposes and persons for whom Exhibits 8A and 12 were prepared.

█ Reports even of a business manager or of a hospital administrator who was not a participant in the incident, if more or less routinely made to improve treatment of patients or hospital procedure, and when not made for purposes of litigation, may properly be received as business records. Reports of the same

officer, where the obvious purpose is to assist in defending litigation, and which result in the securing of testimony by means of ex parte statements of persons unavailable for cross-examination, not all of whom are identified, fall within the class of ex parte statements held inadmissible under *Palmer*, supra and criticized in *Goings*, supra.

To hold otherwise would soon result, to paraphrase Judge Lay in *Goings*, supra, in the art of making supplemental incident reports becoming a science, and the purpose of incident reports and their trustworthiness would be defeated. When their primary utility is litigation and not hospital administration or technique, and when they are made by one not a participant as a supplement to an incident report previously prepared by a participant and make reference to insurance, or an insurance company, or contain other irrelevant or incompetent matter, they are not business records of the kind intended to be received in evidence under the business records acts.

The case is reversed and remanded for a retrial.