## CIRCUIT COURT OF WARREN COUNTY

Roy William Miller

    v.

Warren Memorial Hospital, Inc.

### July 30, 1986

### Case No. (Law) 6895

By JUDGE HENRY H. WHITING

The Court must now rule on the final question of whether it erred in permitting a hospital employee to testify about her "in-house" hospital investigation of the "incident" giving rise to a claim of negligence on the part of hospital employees when a patient cut his foot on glass allegedly left upon the floor of the halls of the hospital.

The issue is reflected in the following portions of the testimony of Mrs. Richardson, a nursing supervisor asked:

> Q. In your responsibility as a nursing supervisor, would you state whether or not you determined on the shift that Mr. Miller came in, that is on the night of July 19th, and before 7:00 AM on July 30th, whether or not there were any instances of breakage or spillage, or any instance of that nature?
>
> A. . . . when [an incident such as this one] comes to my attention I follow it up to see if -- I look at the charting. I may talk with the patient to see the patient's understanding.

My first response in this instance was to see if there was any broken glass anywhere that had been reported on any of the prior two shifts. We did not find any broken glass at all. . . [I] talked to the nurses that were involved to discuss. . . I talked with the head nurse, Miss Celia Olson. . . Then we looked together at the charting to see if the proper protocol had been followed during the night shift. (Excerpts from Richardson transcript beginning at page 5 and ending at page 8.) In the course of discharging her duties. . . to look into this particular incident regarding Mr. Miller. . . we did not find any medication that had been broken at that time on that shift or on the previous shift. . . (or found any other instances of any kind of glass of any sort being broken. (Excerpts from Richardson transcript at pages 10-11.)

Q. In the course of your completing your responsibilities to look into this particular instance, would you state whether or not any medication vials had been broken, dropped, or anything with regard to any of the patients on that floor that day?

A. No. They had not been when we investigated. No medications had been dropped. And, another way that we can check that with visually is that we, also, have a narcotic count. We have to indicate every shift if there is any medication missing that the patients did not receive, we have to affidavit the back of the narcotic record to indicate that medication was dropped, or spilled, or broken, or how it was discarded with a witness.

Q. And, did you look at those records with regard to the day that Mr. Miller was there?

A. Yes, I did.

Q. What did you find?

A. I found that we had not had any instances where the tubexes had been broken, which would cause the narcotic count to be off. (Richardson transcript, pages 14-15.)

When this evidence was proffered, the Court admitted it over the plaintiff's objection, believing that if the witness was carrying out her responsibility for the investigation of the incident in the ordinary course of business of the hospital she would have the right to disclose what information she obtained in the discharge of that duty and the jury could assess its credibility, given the circumstances. The memoranda filed by counsel and its own independent research convince the Court that it was in error in admitting this evidence and that error was prejudicial to the defendant for the reasons which follow:

## (A) ADMISSIBILITY OF EVIDENCE.

(1) *There must in fact be a record.*

Section 235 *Friend on Evidence* (2d ed.), page 518. The evidence introduced was by way of Mrs. Richardson's oral report of her investigation. Perhaps she had a writing and that would have met that requirement but the writing was never proffered, although no objection was made on that ground, and that particular objection may have been waived for that reason since the defendant perhaps could have cured the objection by producing the actual written record. While *Friend* does not make that explicit statement, it is implicit in the entire discussion of the rule by *Friend* involving "the introduction of certain hearsay evidence found in business *records*." (Emphasis added, sect. 235 *Friend* at page 516.)

(2) *Accident reports are not made in the regular course of business.*

To quote *Friend:*

Extraordinary transactions or entries made in other than a routine manner are excluded. It is the routine nature of the entry which gives

it the "guarantee of trustworthiness" previously referred to. *Id*. at 518.

Cited in support of that statement are *Ratliff v. Fewell*, 153 Va. 315 (1927), and *Fink v. Gass & Oil Co.*, 203 Va. 86 (1961). In *Ratliff* one party sought to introduce evidence from a memorandum book of a transaction of the other party which had occurred some three or more years before the entry of the transaction in the book. The Court held this evidence was inadmissible, first because it was not made contemporaneously with the transaction and, second, because it was not made "in the regular course of business." As the Court said:

> Shop books, books of account, bank books, etc., are competent as evidence and frequently useful, but to be admissible or to have any value as such they must ordinarily appear to have been made in the regular course of business and as a part of the party's system of keeping his accounts. Experience has demonstrated that their admission must be hedged about with certain safeguards. (Citing cases.)
> Before entries of this kind can have any probative value, certain prerequisites must appear. . . . The entry must have been a part of a regular series of entries--not, for example, a casual sale of an article not regularly dealt in, or a casual entry at the beginning of a blank book or at the end of a book already finished and laid aside. Again, the entry is not usable if it shows that it embraces in one item a number of separate transactions, or is in any other way so loosely made that regularity of entry cannot be predicted. *Id*. at 327-328.

In *Fink* the Court excluded a letter a consulting physician had written the referring physician who was on the stand describing the injuries from an accident giving rise to the litigation despite a contention that the letter was written to the doctor "in the regular course of business by a consulting physician." *Id*. at 138.

The defendants characterize the nurse's record of the investigation as one made in the ordinary course of business. Courts have taken divergent positions upon this issue, most of the cases being decided under various state statutes embodying the Uniform Business Records as Evidence Act, which § 933, *Evidence*, 30 Am. Jur. 2d 53, says:

> abrogates many of the antiquated and technical common-law rules regarding the admission of business records in evidence and expands the operation of the common-law rule for the admission of such records as an exception to the hearsay rule.

Section 934, *Evidence*, 30 Am. Jur. 2d 54, specifically dealing with accident reports, notes that such reports are not admissible.

> An accident report made by an employee to his employer as required by the employer has been held not to be a document made in the regular course of business so as to be admissible in evidence under the Uniform Business Records as Evidence Act. (Citing *Brown* v. *St. Paul City RR Co.*, 62 N.W.2d 688, 44 A.L.R.2d 535 (Minn. 1954), and *Owens* v. *Seattle*, 299 P.2d 560, 61 A.L.R.2d 417 (Wash. 1956), in support thereof.)

The *Brown* case only held that a conductor's report to his employer of an alleged accident wherein a passenger was injured was discoverable but there was no holding in the case as to whether it was admissible in evidence, and the Court expressly declined to decide that but indicated that it probably would not be admissible, citing in support thereof the case of *Palmer* v. *Hoffman*, 318 U.S. 109, 63 S. Ct. 477, 87 L. Ed. 645, 144 A.L.R. 719 (1943).[1] *Owens* excluded surveying measurements made by one of the city employees of the scene of an accident after the incident upon the ground that, "Neither the

---

[1] That is the extent of the holding in the defendant's cited case of Vandeburgh v. Columbia Memorial Hospital, 457 N.Y.S.2d 591 (A.D. 1982).

exhibits nor the data on which they were based were made in 'the regular course of business' as those words are used in the statute. Both the data and the exhibits were especially prepared for this trial," citing *Palmer* v. *Hoffman* and its annotation at 144 A.L.R. 727. That 1943 decision by Mr. Justice Douglas has spawned much comment, beginning with the annotation at 144 A.L.R. 727 and extending to § 803(6)[07] *Weinstein's Evidence* (1985). In *Palmer* a railroad engineer's report of a crossing accident to his employer, required as a part of the railroad's rules, was held inadmissible under the Federal Business Records Act because:

> not a record made for the systematic conduct of the business as a business. An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made "in the regular course" of the business within the meaning of the Act. . . . Any business by installing a regular system for recording and preserving its version of accidents for which it was potentially liable could qualify those reports under the Act. . . . The probability of trustworthiness of records because they were routine reflections of the day-to-day operations of a business would be forgotten as the basis of the rule. (Citing a case.) Regularity of preparation would become the test rather than the character of the records and their earmarks of reliability (citing a case) acquired from their source and origin and from the nature of their compilation we cannot so completely empty the words of the Act of their historic meaning. If the Act is to be extended to apply not only to

a "regular course" of a business but also to any "regular course" of conduct which may have some relationship to business, Congress not this court must extend it. Such a major change which opens wide the door to avoidance of cross-examination should not be left to implication. 144 A.L.R. 722-723.

Trustworthiness comes into particular focus when "incident" or "accident" reports are considered, and that is the principle underpinning the lower court's decision in *Palmer* and many subsequent cases citing and discussing *Palmer*.

The lower court in *Palmer*, in a comprehensive majority opinion reported at 129 F.2d 976 (2nd Cir. 1942), held the records inadmissible primarily because:

We construe the statute as not making admissible the engineer's statement which, by its very nature, is dripping with motivations to misrepresent. Accordingly, *we decide this and no more: The statute does not permit the introduction in evidence of a hearsay statement in the form of a written memorandum or report concerning an accident, if the statement was prepared after the accident has occurred, where the person who makes the memorandum or report knows at the time of making it that he is very likely, in a probable law suit relating to that accident, to be charged with wrongdoing as a participant in the accident, so that he is almost certain, when making the memorandum or report, to be sharply affected by a desire to exculpate himself and to relieve himself or his employer of liability.*

We do not hold that the engineer's statement is inadmissible under the statute merely because it (1) was prepared to perpetuate evidence or (2) was made after litigation was imminent, or (3) was not a formal document or an entry in a book. (Emphasis in the original.) *Id*. at 991.

*Fagan* v. *City of Newark*, 188 A.2d 427 (N.J. 1963), is strongly critical of *Palmer* but distinguishes the

admission of a fireman's regular report of injury by a co-worker in a company log as a regular entry upon the ground that there was no thought of litigation at the time the report was made, it only arose later in an action against the employer after the fireman died from a cause which allegedly arose in the course of employment.

*Mitchell* v. *American Export Isbrandtsen Lines, Inc.*, 430 F.2d 1023 (1970), admitted a report of an illness sustained by a seaman by the ship's doctor as a document kept in the ordinary course of business of the crew's hospital affairs to refresh the doctor's recollection while testifying as a witness. The Court distinguished *Palmer* v. *Hoffman* upon the ground that there was no motive to falsify this report and, "The surrounding circumstances convince me that the motive has been negated." *Id.* at 1028.

*Picker X-Ray Corp.* v. *Frerker*, 405 F.2d 916 (8th Cir. 1969). The written statement of the hospital business manager relating to his investigation of whether a wire was left in a patient during a surgical procedure held not to be admissible, citing the *Palmer* case, the Uniform Business Record Act and the Missouri Business Record Act as well. That case emphasized the fact that copies of the record were sent to the hospital's attorney and to its insurance carrier, and there is no such evidence of that in this case. However, there was no showing in this case that this was solely a routine investigation "to improve the treatment of patients or hospital procedure and. . . not made for purposes of litigation." *Frerker* at 924. The distinct possibility of litigation makes any such record keeping suspect.

The recent case of *Ashley* v. *Commonwealth*, 220 Va. 705 (1980), while informative primarily for its extension of the shop book rule under limited circumstances to facts and knowledge not within the personal knowledge of the recorder does assume the regularity of the transaction and the basic requirement of the trustworthiness of the recorded information. *Id.* at 708-709. *See also Buchanan, Adm'r.* v. *Higginbotham*, 123 Va. 662, 669 (1918), where regular entries on a merchant's double entry bookkeeping books, even though of somewhat unusual transactions, were held admissible but the Court pointed out that the one large unusual entry was fully corroborated independent of the books and therefore its correctness was not involved but pointed out that:

Books of account of banks and bankers are admissible to prove cash advances, loans and other cash items and this rule has been frequently extended to others where the entries in respect to cash transactions are made in the regular course of business and not merely as casual transactions foreign to the general character of the business conducted.

It could be argued that Mrs. Richardson was not as directly involved in the incident as the engineer was in the *Palmer* case, but she might have had some personal involvement because of a lack of supervision or establishment of proper procedures for the discovery and removal of such glass.[2]

(3) *The data obtained from the books must be related to the recorder by someone who had personal knowledge of that data and who was himself acting in the ordinary course of business.*

*Friend on Evidence* at 519. Cited in support of that proposition are *Automatic Sprinkler Corp. of America v. Coley & Peterson, Inc.*, 219 Va. 781 (1979), and *Ashley v. Commonwealth, supra.* In *Automatic Sprinkler* the recorders' regular notations of material and labor charges to a particular job were held admissible even though they got that information from time sheets and material withdrawal notations of other employees. The Court said this was an exception to the rule requiring the personal knowledge of the recorder where, "Practical necessity requires the admission of written factual evidence based on considerations other than the personal knowledge of the recorder, *provided there is a circumstantial guarantee of trustworthiness*" (citing an earlier Virginia case) (emphasis added), *id.* at 792. The circumstantial evidence of trustworthiness was said to be established by the regularity of (1) furnishing of the information by employ-

---

[2] I do not recall any evidence that this was an insurance company report, as contended in the plaintiff's latest memorandum; if it was, that, of course, would reinforce the Court's ruling.

ees charged with that preparation and (2) of the preparation of the records by the recorder, the fact that the records were relied upon by the business for which the records were kept and the original entries of the material transfers and labor charges were related to those recorders by persons who had personal knowledge of the facts related. In *Ashley* a security director investigating a theft testified from a report he had compiled in the course of his investigation as a security director from the inventory taken and maintained by other employees in the regular course of business. The security director was permitted to testify about entries on an inventory, recording information furnished to those recorders by other persons in the regular course of business of transactions within the personal knowledge of the persons giving the information. The Court noted the trustworthiness of the recordation of information by other evidence, which included personal observation of the security director himself.

*Ashley* cited several earlier Virginia cases which had held that information not personally secured by the witness who seeks to introduce the contents of business records was inadmissible as a violation of the hearsay rule. *Boone* v. *Commonwealth*, 213 Va. 695 (1973), excluded the hospital record of a note by a nurse contained in the admission record to the effect that the ambulance driver had told her that the defendant told him he was in an automobile accident. As the Court said:

> While we have adopted the modern shop book rule, allowing in given cases the admission of verified regular entries without requiring proof of the original observers or record keepers, as an exception to the hearsay rule (citing a case), we have generally restricted this exception. . . to facts or events within the personal knowledge and observation of the recording official to which he could testify if he were called as a witness. *Id.* at 697.

Therefore the Court excluded the nurse's notes since the defendant did not make that statement to her.

Similarly, in *Williams* v. *Commonwealth*, 213 Va. 45 (1972), the Central Criminal Records Exchange notation of the age of a prisoner was held inadmissible to establish

his age in the prosecution of a third party for selling narcotics to him as an under-aged person because:

> The information shown on the reports as to age and date of birth was what McHenry [the alleged infant] told the recording officer, *who had no personal knowledge of the truth* of the statements. Testimony of the recording officer as to McHenry's age would have been hearsay and inadmissible. *Id.* at 46-47.

So in *Nealy* v. *Johnson*, 215 Va. 565, 571 (1975), also cited in *Ashley*, a record of a doctor's opinion in a hospital record was rejected because not restricted to "facts or events within the personal knowledge and observation of the recorder to which he could testify if called as a witness."

Mrs. Richardson had no personal knowledge of what went on just prior to the time the plaintiff was injured. She necessarily relied upon what the duty nurses and others had told her about the absence of glass upon the hospital floors. The plaintiff was deprived of the opportunity of asking those persons who were allegedly looking how carefully they looked, how long they looked, where they looked and what other duties they may also be performing at that time. Additionally, there is no independent corroboration of the absence of glass at the time when these other nurses looked. There is some evidence that Mrs. Richardson and other people looked, but no one has testified that they were looking at the same time the other hospital personnel and nurses were looking who made the report to Mrs. Richardson. That distinguishes *Ashley* because in *Ashley* the security director had an independent knowledge of the absence of the stolen hams and the inventory only corroborated that knowledge.

Holdings in other states construing the Uniform Act as to third party reports to the recorder are instructive. *Wright* v. *McCoy*, 343 N.Y. Supp. 2d 143 (S.C. A.D. 1973), a police officer's accident report, while made in the ordinary course of duty, was inadmissible because the information was obtained from persons who were not under a business duty to relate the facts to the police officer. For the same rulings for the same reasons, *see Ryan* v. *Campbell "66" Express, Inc.*, 304 S.W.2d 825 (Mo.

1957); *MacLean* v. *City of San Francisco*, 311 P.2d 158 (Cal. App. 1957); *Haas* v. *Kasnot*, 92 A.2d 171 (Pa. 1952).

The federal statute in effect when *Palmer* was decided had this sentence in it: "All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect the admissibility." Title 28 USCA § 695. The present federal statute no longer has this sentence in the "regular course of business" statute. Title 28 USCA § 1732. The Uniform Business Records as Evidence Act, withdrawn in 1966, contained this provision:

> A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and, if, in the opinion of the Court, the sources of information, method and time of preparation were such as to justify its admission.

*Behr* v. *Santa Cruz*, 342 P.2d 987 (Cal. App. 1959), excluded the report of a fire ranger of his investigation of the origin of the fire allegedly emanating from a county dump because it was based on statements made to him by other parties.

While my initial reaction at trial was that all record keeping involved the danger of self-justification, which a jury could weigh in this case as well as in any other case in which a regular business record was kept, cf. *Picker X-Ray Corp.* v. *Frerker*, 405 F.2d 916, 922 (8th Cir. 1969), the danger of colored testimony from the informants to the record keeper (Mrs. Richardson) to protect their own positions made it mandatory that those informants be cross-examined. I recognize that most of the cases justify exclusion of police accident reports from third party witnesses upon the ground that they were under no duty to report the facts correctly, and some cases have indicated that where employees under a duty to report facts correctly to an employer, making their hearsay statements admissible where the very accident reported might conceivably damage the employee's relations

with the employer if reported correctly, the employee's motive to fabricate is even stronger than the casual witness. Moreover, while none of the cases have discussed this, it does seem to me that anyone who gives a false report to a police officer might possibly subject himself to a criminal prosecution, thus giving rise to a citizen's duty to correctly report what he sees in the accident.

The Virginia decisions applying the "modern shop book" or "business record" rules convince me that it would regard an accident report or investigation as not made in the ordinary course of business, even if done pursuant to pre-arranged procedures. This would be especially true if any of the informants had a possible involvement with prospective litigation and could not be cross-examined.

(4) *Did the erroneous admission of this evidence prejudice the plaintiff?*

Section 799, *Appeal and Error*, 5 Am. Jur. 2d 248:

Where a case has been tried to a jury, the appellate courts frequently take the view that an erroneous admission of incompetent evidence is presumed to have been prejudicial, since the possibility cannot be excluded that the verdict of the jury may have been influenced by the improperly admitted evidence.

A number of cases were noted in support thereof, including *Adams* v. *Ristine*, 138 Va. 273, 122 S.E. 126 (1924). In the *Adams* case the Court held that the cross-examiner improperly required a witness to answer certain questions regarding an exhibit and it was insisted that his answer that he did not know and could not say whether the signature on the exhibit was a forgery made the testimony harmless, but the Court said that it was not harmless since it tended to impeach the witness as to his knowledge of the testator's handwriting. However, the Court held that since that witness displayed so little acquaintance with the testator's handwriting "that his answers to the unfair questions propounded to him could have but little effect upon the minds of the jurors." Unlike the *Adams* case, in which there was a great deal of other evidence supporting the theory of both sides, the

issue of whether there was glass on the floor was crucial and while other nurses denied seeing it, it could not be said that hearsay testimony from a number of absent nurses and hospital employees could not have prejudiced the plaintiff's case. 1B Michie's Jurisprudence, page 482, *Appeal and Error*, § 299, states:

> The admission of evidence is not ground for reversal when it clearly appears that the objector was not prejudiced thereby. But if it may have prejudiced him, though it is doubtful whether it did or not, it will be cause for reversal of the judgment.

Cited in support of that proposition are a number of Virginia cases, including the following: *Haines v. Commonwealth*, 104 Va. 854 (1905). Evidence of a defendant's involving a young girl in prostitution and giving her alcohol to drink was collateral and inadmissible in her trial for the attempted bribing of a policeman and the case reversed: "If the accused may have been prejudiced by the evidence, even though it be doubtful whether in fact she was so or not, it is sufficient for reversal of the judgment," *Id.* at 859.

*Chesapeake & Ohio RR. Co.* v. *Ghee*, 110 Va. 527 (1910). Evidence of the small amount of property owned by a decedent held inadmissible in a wrongful death action and the case reversed for its admission.

*Norfolk & Western RR. Co.* v. *Briggs*, 103 Va. 105 (1904). Evidence of other fires which may have been set by other engines of the railroad held inadmissible on a charge of a specific fire by a specific train and the case reversed because: "Where illegal evidence has been admitted, the judgment must be reversed, as it cannot be said what effect the illegal evidence may have had upon the minds of the jury." *Id.* at 113.

*Blue Ridge Light Co.* v. *Price*, 108 Va. 652 (1908). Statements by the motorman about stopping his streetcar held inadmissible, there being a conflict in the evidence as to whether he did or not and the plaintiff's action for injuries being dependent upon establishing that he did and the evidence being in conflict, the case was reversed. "How much the evidence improperly admitted may have affected the minds of the jury in reaching their verdict it is impossible for this Court to estimate and

it would. . . be going beyond our legitimate function to enter upon such speculation." *Id*. at 655-656.

The Court, believing that the evidence was improperly admitted and that it may have affected the jury in arriving at its verdict, must set be aside the verdict and re-try the case.