633 A.2d 895

**Abras Sandy Q. MORRISON**

v.

**STATE of Maryland.**

**No. 269, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Dec. 6, 1993.

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Sarah E. Page, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Thomas E. Hickman, State's Atty. for Carroll County, Westminster, on the brief), for appellee.

Submitted before MOYLAN, ALPERT and MURPHY, JJ.

ALPERT, Judge.

Abras Sandy Q. Morrison, the appellant, was convicted by a jury in the Circuit Court for Carroll County of murder,

conspiracy to commit murder, kidnapping, and robbery. He presents four questions on appeal:

I.    Did the trial court err in admitting evidence of appellant's financial need?

II.   Did the trial court err in admitting hearsay evidence?

III.  Did the trial court err in excluding from evidence appellant's proposed Exhibit Number One?

IV.  Did the trial court err in denying appellant's motion to suppress a statement to the police?

On or about August 18, 1991, seventy-four-year-old Margaret Cullen was reported to Baltimore City Police as a missing person. In the course of investigating Mrs. Cullen's disappearance, the police also discovered that a brown Cadillac belonging to Mrs. Cullen and her husband was missing from the Cullens' home in Baltimore. Further investigation led police to the home of Troy Shellington.

At 6:30 on the evening of August 24, 1991, the police saw the appellant in the Cullens' car in front of Troy Shellington's home. He pulled the car to the curb, turned the ignition off, and got out of the car. He was in the process of walking away from the car when the police approached him. They asked him whose car it was. He said it belonged to a friend of his, Troy Shellington, who was in the house where the car was parked. The police informed the appellant that the car was reported stolen and that he was under arrest for operating a stolen vehicle. He was handcuffed and transported to police headquarters.

The police also talked with Troy Shellington, who agreed to accompany them to police headquarters. Later that night, Shellington led the police to a cornfield in Carroll County, where the badly decomposed body of Mrs. Cullen was found under a blanket, plastic, and newspapers.

Early the following morning, the police confronted the appellant with what they had found and what Shellington had told them. The appellant made an audiotaped confession concerning the events that led to Mrs. Cullen's death. In that

confession (the transcript of which fills twenty typewritten pages), he told the following story.

.The appellant, a nursing assistant, met Mrs. Cullen when he went to work for her husband, an elderly dentist, when Dr. Cullen was hospitalized. When Dr. Cullen was released from the hospital in July of 1991, the appellant began working for the Cullens at their home. (Dr. Cullen was later readmitted to the hospital.) Believing that he was "underpaid and over-worked" because Mrs. Cullen was paying him less than they had agreed, the appellant quit the job and stole one of Mrs. Cullen's blank checks. He wrote himself a check for $2,000.00, forged Mrs. Cullen's signature, and deposited it in his account. When the forgery was discovered, the appellant was told that criminal charges would be brought against him by the bank if he did not repay the $2,000.00.

The appellant tried to convince Mrs. Cullen to persuade the bank to "drop the charges" against him. He went to her house and knocked on both the front door and the back door, but no one answered. As he was leaving, the police arrived and told him that Mrs. Cullen had reported that he was disturbing her. They told him that if he returned, he would be charged with trespassing.

Early the following morning, the appellant and Shellington (who had also worked briefly for Mrs. Cullen) broke into the Cullens' basement and waited there. When Mrs. Cullen awoke and unlocked the inside door to the basement, the two men grabbed her and tied her to a chair. They had planned to "force" her to drop the charges by having her call the bank. When the scheme did not work out as planned, they decided to take her "out to the country somewhere and just put her there, and just leave her there and by the time she get back to the city, we would have had gone or would have taken care of the $2,000 or hopefully she would have wandered off and got lost somewhere, that's what we were sort of hoping and then come back and then by then, money is paid to the bank and there's pretty much nothing she can say or, or do." ·

They waited until dark and drove Mrs. Cullen out Reisterstown Road to Carroll County and tried to abandon her in a cornfield. It was very dark, and when the men began to leave, Mrs. Cullen "ran into the knife" that Shellington was holding. They dragged her body back into the field and covered it with a blanket, plastic bags, newspapers, and some brush.

The appellant and Shellington returned to the Cullens' house and took various items including a television, a computer, and jewelry.

## I.

Dacia Allmond, the sister of the appellant's girlfriend, testified for the defense concerning the appellant's whereabouts and activities during the week of August 13 through 17 of 1991. During the State's cross-examination of the witness, the following occurred.

Q: Okay. And did you have a—this week that you've been questioned about, did you have discussions with Mr. Morrison during that period of time?

A: Yes.

Q: And do you recall discussions about money?

[DEFENSE COUNSEL]: Objection, Your Honor.

[PROSECUTOR]: (Inaudible) certainly test . . .

THE COURT: I'll—I'll overrule.

BY [PROSECUTOR]:

Q: Re . . .

THE COURT: He's talking about the period.

BY [PROSECUTOR]:

Q: . . .—recall discussions about money?

A: Yes.

Q: And was he having money problems?

A: Yes, he was.

Q: He was—did you tell the police he was desperate for money?

A: No, I did not.

Q: Did you tell 'em he needed money?

A: Yes.

Q: Okay.  Do you know what for?

A: No.

The appellant contends that the court erred in admitting that testimony.  He claims that the evidence was inadmissible for two independent reasons.  First, relying on *Vitek v. State*, 295 Md. 35, 453 A.2d 514 (1982), he claims that evidence of his need for money was irrelevant and prejudicial.  Second, he claims that the line of cross-examination was well beyond the scope of direct examination of the witness, which was limited to the appellant's whereabouts at specific times between the victim's disappearance and the discovery of her body.  Assuming, without deciding, that the issue was preserved for our review, we disagree.

The appellant's reliance on *Vitek* is misplaced.  As the Court noted in that case, evidence of an accused's financial situation is admissible under special circumstances that show a nexus between the accused's financial status and the motive for a particular crime.  In the instant case, the State presented evidence tending to show that the appellant committed the crimes at issue because he was unable to repay the $2,000.00 he had stolen and was unable to convince the victim to drop the charges.  The testimony that the appellant complains about was merely cumulative to the evidence tending to show that the appellant had a particularized motive to commit the crimes in this case.

We also reject the appellant's second claim of error.  "[I]n the absence of a showing of prejudice or of abuse, considerable discretion as to whether cross-examination should be permitted to extend beyond the scope of the direct examination is vested in the trial judge." *See Marlow, Infant v. Davis*, 227 Md. 204, 211, 176 A.2d 215 (1961). *See also Oken v. State*, 327 Md. 628, 669, 612 A.2d 258 (1992).  We perceive no abuse of discretion.

## II.

The appellant testified in his own defense. During his cross-examination by the State, the following occurred:

Q:  And, when you talked about the blanket that you put over this lady, you said, "The blanket came from out of their car." It wa—"It was, it was already in the car." [S]o that that blanket that was found wrapped around her came from the trunk of her Cadillac, isn't that correct?

A:  No, sir.

Q:  It didn't?

A:  No, sir.

Q:  Where do you say it came from now?

A:  I'd driven Mrs. Cullen's car before, sometime in July when I was working for her. I remember that because she told me make sure I bring her car back, 'cause she—she got my name and number in her diary, and she would write down everything about me. So, we laughed and I took the car, and the blanket was in the back seat.

Q:  She wrote down everything about you in the diary?

A:  I don't know if she wrote down everything, ...

Q:  Well, that what ...

A:  ... but I know ...

Q:  ... you just said, isn't it?

A:  I said my name, my number.

Q:  Do you recognize this?

A:  No, sir.

Q:  You don't recognize that as her diary?

A:  No, sir. I never saw her diary. She just told me.

Q:  Let me read something to you, and let's—tell me if this is accurate.

"Au—Monday, August 12th: Abras came back to both front and back doors and banged on both doors. I called 911 and two police cars arrived just as he was getting in his yellow car. After quite a spell, they all drove off in separate

cars, don't know what transpired. Abras pleaded desperately ..."

[DEFENSE COUNSEL]: I'm gonna object to all of this, Your Honor.

[PROSECUTOR]: He said it.

[DEFENSE COUNSEL]: I know.

[PROSECUTOR]: He's already identified this, Your Honor, and I have a right to ask him about it on cross.

[DEFENSE COUNSEL]: Would like to approach.

THE COURT: Yeah.

(Counsel approached the bench and the following ensued:)

[DEFENSE COUNSEL]: Your Honor, there's been no identification by my client that this is her diary, ...

[PROSECUTOR]: He said ...

[DEFENSE COUNSEL]: ... and ...

THE COURT: He said she wrote everything down, ...

[PROSECUTOR]: In her diary.

THE COURT: ... but this diary hasn't been identified and ...

[DEFENSE COUNSEL]: (Inaudible).

[PROSECUTOR]: Oh. You mean like where did we get it and all?

THE COURT: No, no.

[PROSECUTOR]: Take it out of her house?

THE COURT: He didn't—well, no, no. When you said, "Do you know what this is?" He says, "I haven't seen it before."

[PROSECUTOR]: All right. I'll show it to him.

[DEFENSE COUNSEL]: You already did. He says he didn't recognize it.

[PROSECUTOR]: Well, then, I'll show him the handwriting.

THE COURT: Well, I don't know what the handwriting is gonna do for you, but ...

[PROSECUTOR]: Well, I have a right to ask him the ...

THE COURT: You can show him.

[PROSECUTOR]: ... question. He can deny the question.

THE COURT: Yes. Okay.

[PROSECUTOR]: Right. I mean, the question in the book.

THE COURT: Well, what's the question in the book.

[PROSECUTOR]: I have a right to read him the statement in the book and see if—ask him if that's true.

THE COURT: I'll let him—I'll let you do that.

(Counsel returned to the trial tables and proceedings resumed in open Court.)

CROSS–EXAMINATION (Resumed)

BY [PROSECUTOR]:

Q: Do you recognize her handwriting?

A: Is this her diary?

Q: Yes, sir.

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: No. I'd overrule. He can answer the question.

BY [PROSECUTOR]:

Q: Would you like to compare it with her checkbook that's in evidence?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: I'll sustain.

THE WITNESS: I mean, this looks like her handwriting.

BY [PROSECUTOR]:

Q: Looks like her handwritin', ...

A: Yeah.

Q: ... doesn't it?

A: It looks like her handwritin'.

Q: Uh-huh. Let me finish the statement for you, Mr. Morrison. "Abras pleaded desperately for me to call Signet Bank, Northern Parkway, and tell them I had dropped charges against him. No way."

[DEFENSE COUNSEL]: Objection, Your Honor.

BY [PROSECUTOR]:

Q: Does that describe ...

THE COURT: I'll overrule.

BY [PROSECUTOR]:

Q: ... your being there on the 12th?

A: Does that describe my being there on the 12th?

[DEFENSE COUNSEL]: Objection.

THE COURT: Well, I don't know what—what your—I don't know what your question is.

BY [PROSECUTOR]:

Q: All right. Did you bang on the front doors and the back doors?

A: Yes, sir. I never denied that.

Q: Did you plead desperately that she drop the charges?

A: No, sir. I never pleaded desperately.

■ The appellant contends that the court thereby permitted the introduction of inadmissible hearsay. The State counters that the contents of the deceased victim's diary were admissible under the present sense exception to the hearsay rule. We agree that the court did not err in permitting the cross-examination, but not for the reason advanced by the State.

In *Booth v. State,* 306 Md. 313, 324, 508 A.2d 976 (1986), the Court of Appeals concluded "that the 'present sense impression' exception to the hearsay rule rests upon a firm foundation of trustworthiness, and we adopt it in the form in which it appears at Fed.R.Evid. 803(1)." The federal rule defines "present sense impression" as follows: "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." As the Court pointed out in *Booth,* "However, because the presumed reliability of a statement of present sense impression flows from the fact of spontaneity, the time interval between observation and utterance must be very short." 306 Md. at 324, 508 A.2d 976. *See also, United States v. Narciso,* 446 F.Supp. 252 (1977); *Picker X–Ray Corpora-*

*tion v. Frerker,* 405 F.2d 916 (1969). In the instant case, the record does not reflect how long after the event the victim made the diary entry. Since there was no evidence to show that the diary entry was made contemporaneously with, or even immediately after, the events described therein, it was not admissible as a present sense impression. *See United States v. Nanny,* 745 F.Supp. 475 (1989); *United States v. Cruz,* 765 F.2d 1020 (1985).

We nonetheless reject the appellant's claim that the court permitted the introduction of inadmissible hearsay. "Hearsay may be defined as an out-of-court assertion offered in court for the truth of the matter asserted, resting for its value upon the credibility of the out-of-court asserter." *Ali v. State,* 67 Md.App. 339, 507 A.2d 648 (1986). A careful review of the cross-examination we have recounted reveals that the victim's diary was not offered for the truth of the matters asserted therein. Indeed, the diary was not "offered" at all. It was not admitted in evidence, nor did any witness testify as to its contents. The prosecutor did, however, read an excerpt from the diary and ultimately asked the appellant whether that described his presence at the Cullen home on August 12th. There was no direct response and, consequently, the prosecutor abandoned that question and propounded several direct questions to the appellant. The answers to those questions given by the appellant rested upon his credibility, not that of the victim. The questions themselves were not evidence; indeed, the trial judge so instructed the jury. They may, however, have run afoul of the rule prohibiting questions that assume facts not in evidence. *See Tirado v. State,* 95 Md.App. 536, 550, 622 A.2d 187 (1993). Error, if any, was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 652, 350 A.2d 665 (1976).[1]

---

1. This case is obviously distinguishable on its facts from *Crawford v. State,* 285 Md. 431, 453, 404 A.2d 244 (1979), wherein the Court of Appeals stated:

    In the particular circumstances of this case, we believe that the placing before the jury of challenged portions of the interrogations

## III.

▮ The appellant's taped confession was entered into evidence in the State's case-in-chief. The appellant subsequently testified that he was threatened, beaten, and induced into making the statement, and further asserted that his knowl-edge of the crimes came solely from his co-conspirator, Troy Shellington. The appellant testified that Shellington had related to him the story of the victim's death immediately before the appellant's arrest, and that the appellant had then instructed Shellington to write down everything he knew about the crimes so that the appellant could help Shellington. The appellant also testified that he implicated himself during the taped statement because the police had suggested that only then could he be a State's witness against Shellington.

On rebuttal, the State called the police officers who testified that the appellant was not threatened, beaten, or induced into making the statement, but rather that it was given freely and voluntarily. Detective Sergeant Nolan testified that he was not aware of any notes recovered from Shellington either at the time of his arrest or at the time of booking.

Following rebuttal, the appellant sought to admit, as surrebuttal evidence, handwritten notes allegedly written by Shellington, although counsel offered the notes, "not necessarily for the truthfulness of 'em, but the fact that they were written by Mr. Shellington . . . ." The State replied that the notes were not in Shellington's handwriting and were inadmissible hearsay. The trial court ruled that the notes were beyond the scope of rebuttal, and therefore did not rule on their reliability. The appellant contends that the notes should have been admitted. We disagree.

▮ The trial court correctly ruled that the notes were not proper surrebuttal. "Surrebuttal is essentially a rebuttal

---

did not meet the "civilized standards for a fair and impartial trial." . . . . To permit the jury to hear them failed to observe that fundamental fairness essential to the very concept of justice and was "inconsistent with the rudimentary demands of fair procedure . . . ."

to a rebuttal." *Solko v. State Roads Commission,* 82 Md.App. 137, 149, 570 A.2d 373, *cert. denied,* 320 Md. 222, 577 A.2d 50 (1990). Thus, the principles applicable to the admissibility of rebuttal evidence are equally applicable to surrebuttal evidence. The question of what constitutes proper rebuttal evidence rests in the sound discretion of the trial court. *Hardaway v. State,* 72 Md.App. 592, 602, 531 A.2d 1305 (1987), *rev'd on other grounds,* 317 Md. 160, 562 A.2d 1234 (1989). The trial court's determination will not be reversed on appeal unless the ruling is both "manifestly wrong and substantially injurious." *Campbell v. State,* 65 Md.App. 498, 507, 501 A.2d 111 (1985), *cert. denied,* 305 Md. 599, 505 A.2d 856 (1986) (quoting *Huffington v. State,* 295 Md. 1, 14, 452 A.2d 1211 (1982)).

Here, the trial court's ruling was not "manifestly wrong." The State's rebuttal evidence replied to the appellant's testimony that his taped confession had been involuntary. The proposed surrebuttal, relating to notes that Shellington had allegedly made regarding the crime, would not have replied to the voluntariness issue. Admission of the notes would not have advanced the appellant's theory of involuntariness; only evidence tending to show that the police unlawfully convinced him to implicate himself would have done so. The court did not err in refusing to admit the statement as surrebuttal evidence.

## IV.

The appellant filed a pretrial motion to suppress the audiotaped confession he made to the police, and a pretrial hearing was held on the motion. The appellant testified at the hearing, as he did later at trial, that he was physically beaten and stabbed with a pencil, that he was threatened in various ways including the possible deportation of his mother, that he was offered various inducements, that he was not afforded an opportunity to drink when he was thirsty or to use the restroom, and that in various other ways, the officers overbore his free will. The officers testified that none of this occurred. The hearing judge believed the officers and denied the motion.

The appellant contends that the statement should nevertheless have been suppressed. First, he claims that the statement itself shows that it was the product of an improper inducement. ("I was told that it will help ease time on myself and help the court see that it wasn't something planned or premeditated.") Second, he claims that the statement was involuntary under the totality of the circumstances. We disagree.

The standard for our review was set forth by Judge Orth in *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990). (Citations omitted.):

When the question is whether a constitutional right, such as the one here, has been violated, we make our own independent constitutional appraisal. We make the appraisal by reviewing the law and applying it to the peculiar facts of the particular case. When the facts are in dispute, we accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him. In ascertaining whether he is clearly erroneous, we give "due regard to the opportunity of the trial court to judge the credibility of the witnesses," as commanded by Md.Rule 8–131(c). When the question of the dishonor of a constitutional right arises by the denial of a motion to suppress, the relevant facts which we consider "are limited to those produced at the suppression hearing, which are most favorable to the State as the prevailing party on the motion."

We have reviewed the transcript of the appellant's audiotaped confession and the transcript of the suppression hearing. We are satisfied from our own independent constitutional appraisal of the totality of the circumstances that the appellant's confession was not involuntary. The court did not err in denying the motion to suppress.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**