Circuit Court for Carroll County
Case No. 06-K-91-016826

IN THE SUPREME COURT

OF MARYLAND

No. 29

September Term, 2023

_____

ABRAS SANDY Q. MORRISON

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

PER CURIAM

_____

Filed: February 28, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case involves an appeal of the circuit court's order denying Abras Sandy Q. Morrison's, Appellant's, petition for postconviction DNA testing under Md. Code Ann., Crim. Proc. ("CP") § 8-201.

In 1992, in the Circuit Court for Carroll County in Case No. 06-K-91-016826, Mr. Morrison was convicted of first-degree murder, kidnapping, robbery, conspiracy to commit first-degree murder, conspiracy to commit kidnapping, and conspiracy to commit robbery. The circuit court sentenced Mr. Morrison to life imprisonment without the possibility of parole for first-degree murder, twenty years concurrent for kidnapping, five years concurrent for robbery, and life imprisonment concurrent for conspiracy to commit murder, with the remaining conspiracy convictions merging for sentencing purposes.[1] At the sentencing proceeding, the prosecutor advised that the State had filed a notice of intent to

---

[1]At the time of Mr. Morrison's sentencing, Md. Code (1957, 1992 Repl. Vol.), Art. 27, § 412(b), concerning the penalty for first-degree murder, provided in relevant part:

> Except as provided under subsection (f) of this section, a person found guilty of murder in the first degree shall be sentenced to death, imprisonment for life, or imprisonment for life without the possibility of parole. The sentence shall be imprisonment for life unless: . . . (2) the State notified the person in writing at least 30 days prior to trial that it intended to seek a sentence of imprisonment for life without the possibility of parole under § 412 or § 413 of this article.

Md. Code (1957, 1992 Repl. Vol.), Art. 27, § 412(d) provided that, "[e]xcept as provided by § 413 of this article, the court shall decide whether to impose a sentence of life imprisonment or life imprisonment without the possibility of parole." Md. Code (1957, 1992 Repl. Vol.), Art. 27, § 413 concerned the sentencing procedure upon a finding of guilt of first-degree murder where the State had given notice under § 412(b) of its intent to seek a sentence of death. A sentencing proceeding involving a request for the imposition of a death sentence was to be conducted before the jury unless a jury sentencing proceeding was waived by the defendant, in which case the proceeding would be before the court alone. See Md. Code (1957, 1992 Repl. Vol.), Art. 27, § 413(b).

seek a sentence of life without parole and that the notice had been served on Mr. Morrison more than thirty days prior to trial. In requesting a sentence of life without parole for the offense of first-degree murder, the prosecutor argued that Mr. Morrison was a "well-educated and a very bright young man,"

who very cruelly betrayed a senior citizen, who was seeking his help to assist her with her invalid husband, certainly, a circumstance of betrayal which stands out among the many that may have come before this Court: stole a check from her home, forged the check, cashed the check, and spent the money. There are at least three separate crimes in that instance: three separate periods of deliberation that he made at the very outset of this string of events. And then he had several weeks after that to do something about that, to rectify that, to come forward, to make restitution; would not have been prosecuted if there were restitution, according to the testimony that we have heard. . . .

He elects to bring in an accomplice and proceed to a foray of crime, which can only be described as horrible. They shop for their burglary tool on one day. The next day they break into her home committing burglary. They, apparently, spent seven hours, from something like 2:30 in the morning to 9:30, waiting to commit this crime. Seven hours in which to undo what he had done, because they had very carefully cut out the window in the basement that would -- had they left -- and they, in fact, did leave because Shellington[2] had to go to work, or he thought he had to go to work. He had all these chances to reverse course. He would not even have been charged with burglary or caught for burglary had he not come back. When they found out Shellington didn't have to work, they came back. Said he thought about it in his statement. "I thought about it but not for long."

They then go in and rob this woman, assault her, bound her in cruel fashion, to say the least -- one wonders where he learned how to do that -- forced her to call her bank, kidnapped her, robbed her, and finally they brutally and premeditatedly murdered her in Carroll County, and the jury so convicted them.

Then, there's a period of ten days. During that period of time, there is not one indication of atonement, of regret, of coming forward, of reversing course. Instead, they proceed to very carefully cover up their crime with the things that they did at home: taking in the mail, leaving food for the dog, packing her bags, leaving the telephone directory open to the travel agencies;

_____

[2]In its December 4, 2024 memorandum opinion and order, the circuit court referred to Troy Shellington as Mr. Morrison's codefendant.

and according to his own witnesses, he enjoys driving her car all during this time right up to the moment of his arrest, some ten days after the -- this murder and, of course, he tried to sell the car. These acts -- and if you lay it all out, there are at least fifteen separate crimes, fifteen separate periods of action in this case in which this man had time to deliberate, time to decide, time in every single event to make choice; to make a choice between right and wrong. . . .

The circuit court imposed the sentence of life without parole after having considered the facts of the case and the pre-sentence report, and hearing from Mr. Morrison's witnesses (two of his sisters spoke at the sentencing hearing), the prosecutor, Mr. Morrison's attorney, and Mr. Morrison. In imposing sentence, the circuit court stated, among other things, that the case "involved a murder that was carefully planned[,]" and that "[i]t was not a spur of the moment act and [Mr. Morrison] had been in th[e] household as a result of employment, in a position of trust. Mrs. Cullen was a vulnerable victim, and she is dead as a result."

Mr. Morrison filed a notice of appeal and, on December 6, 1993, in a reported opinion, the Appellate Court of Maryland affirmed the convictions. See Morrison v. State, 98 Md. App. 444, 633 A.2d 895 (1993). In its opinion, the Appellate Court described the facts of the case as follows:

> On or about August 18, 1991, seventy-four-year-old Margaret Cullen was reported to Baltimore City Police as a missing person. In the course of investigating Mrs. Cullen's disappearance, the police also discovered that a brown Cadillac belonging to Mrs. Cullen and her husband was missing from the Cullens' home in Baltimore. Further investigation led police to the home of Troy Shellington.
> At 6:30 on the evening of August 24, 1991, the police saw the appellant in the Cullens' car in front of Troy Shellington's home. He pulled the car to the curb, turned the ignition off, and got out of the car. He was in the process of walking away from the car when the police approached him. They asked him whose car it was. He said it belonged to a friend of his, Troy

Shellington, who was in the house where the car was parked. The police informed the appellant that the car was reported stolen and that he was under arrest for operating a stolen vehicle. He was handcuffed and transported to police headquarters.

The police also talked with Troy Shellington, who agreed to accompany them to police headquarters. Later that night, Shellington led the police to a cornfield in Carroll County, where the badly decomposed body of Mrs. Cullen was found under a blanket, plastic, and newspapers.

Early the following morning, the police confronted the appellant with what they had found and what Shellington had told them. The appellant made an audiotaped confession concerning the events that led to Mrs. Cullen's death. In that confession (the transcript of which fills twenty typewritten pages), he told the following story.

The appellant, a nursing assistant, met Mrs. Cullen when he went to work for her husband, an elderly dentist, when Dr. Cullen was hospitalized. When Dr. Cullen was released from the hospital in July of 1991, the appellant began working for the Cullens at their home. (Dr. Cullen was later readmitted to the hospital.) Believing that he was "underpaid and overworked" because Mrs. Cullen was paying him less than they had agreed, the appellant quit the job and stole one of Mrs. Cullen's blank checks. He wrote himself a check for $2,000.00, forged Mrs. Cullen's signature, and deposited it in his account. When the forgery was discovered, the appellant was told that criminal charges would be brought against him by the bank if he did not repay the $2,000.00.

The appellant tried to convince Mrs. Cullen to persuade the bank to "drop the charges" against him. He went to her house and knocked on both the front door and the back door, but no one answered. As he was leaving, the police arrived and told him that Mrs. Cullen had reported that he was disturbing her. They told him that if he returned, he would be charged with trespassing.

Early the following morning, the appellant and Shellington (who had also worked briefly for Mrs. Cullen) broke into the Cullens' basement and waited there. When Mrs. Cullen awoke and unlocked the inside door to the basement, the two men grabbed her and tied her to a chair. They had planned to "force" her to drop the charges by having her call the bank. When the scheme did not work out as planned, they decided to take her "out to the country somewhere and just put her there, and just leave her there and by the time she get back to the city, we would have had gone or would have taken care of the $2,000 or hopefully she would have wandered off and got lost somewhere, that's what we were sort of hoping and then come back and then by then, money is paid to the bank and there's pretty much nothing she can say or, or do."

- 4 -

They waited until dark and drove Mrs. Cullen out Reisterstown Road to Carroll County and tried to abandon her in a cornfield. It was very dark, and when the men began to leave, Mrs. Cullen "ran into the knife" that Shellington was holding. They dragged her body back into the field and covered it with a blanket, plastic bags, newspapers, and some brush.

The appellant and Shellington returned to the Cullens' house and took various items including a television, a computer, and jewelry.

Id. at 447-49, 633 A.2d at 897-98.

Between March 1997 through June 1998, Mr. Morrison, proceeding *pro se*, filed two petitions for postconviction relief. In January 1999, the circuit court conducted a hearing on the petitions for postconviction relief and, in August 1999, denied relief on all grounds. Mr. Morrison filed an application for leave to appeal, which was denied by the Appellate Court.

On November 6, 2023, Mr. Morrison, proceeding *pro se*, filed a "Petition for DNA Testing," pursuant to CP § 8-201, seeking testing of a white towel containing blood and a hair that was "retained for analysis," and asserted that DNA testing of the towel and hair would produce mitigating evidence with respect to his sentence by negating the idea that another person who purportedly admitted to participation in the murder was less culpable than him.[3] In the Petition for DNA Testing, Mr. Morrison asserted that "DNA testing has the scientific potential to produce mitigating evidence relevant to [his] claim of wrongful sentence[,]" in particular, the "wrongful enhanced/increased sentence of life without

---

[3]Mr. Morrison attached as an exhibit to the Petition for DNA Testing a Baltimore Police Department Laboratory Report dated September 12, 1991, from the Trace Analysis Unit, which identifies the defendants as Mr. Morrison and Mr. Shellington. The report states that six items were recovered from the victim, including "Item 1 – yellow panties[.]" The report states that a hair was recovered from inside Item 1 and retained for possible future analysis.

parole[,]" because it will dispel the belief "being maintained" that Troy Shellington, his co-conspirator, "is less culpable than [him.]"  On November 28, 2023, without having received an answer from the State, and without a hearing or providing an explanation as to why no hearing was required as required by Maryland Rule 4-709(e), the circuit court denied the Petition for DNA Testing by stamping the front page of the petition "DENIED[.]"

Mr. Morrison filed a notice of appeal, and the Appellate Court issued an order transferring the appeal to this Court, in light of the fact that orders denying postconviction DNA testing are appealable directly to this Court pursuant to CP § 8-201(k)(6).  On January 22, 2024, this Court issued an order remanding the case to the Circuit Court for Carroll County with instruction that, pursuant to Maryland Rule 4-706(c), the State shall be provided a 60-day time period to file an answer to the Petition for DNA Testing and that, pursuant to Maryland Rule 4-705(b), a copy of the Petition for DNA Testing shall be forwarded to the Collateral Review Division of the Office of the Public Defender.[4]  In addition, this Court ordered that, if upon consideration of the State's answer, the circuit court determined that the Petition for DNA Testing should be denied without a hearing, it shall issue a written order pursuant to Maryland Rule 4-709(e) stating the reasons why no hearing on the Petition for DNA Testing was required and that the order be transmitted to

---

[4]In the Petition for DNA Testing, Mr. Morrison advised that he is indigent and unable to pay the cost of testing or counsel, and requested that the circuit court appoint counsel.  The petition had been denied without any indication that a copy of the petition was forwarded to the Collateral Review Division of the Office of the Public Defender as required by Maryland Rule 4-705(b).

this Court no later than 90 days from the date of the Order. In the alternative, the circuit court was to provide a written update as to the status of the case no later than 90 days from the date of the Order and this Court retained jurisdiction over the case, pending further review.

On May 24, 2024, the State filed a response to the petition for DNA testing,[5] and on September 27, 2024, the circuit court held a hearing. On December 4, 2024, the circuit court issued a Memorandum Opinion and Order denying Mr. Morrison's petition for DNA testing.[6] The circuit court found that there was no reasonable probability that DNA testing of the hair at issue would result in mitigating or exculpatory evidence as to Mr. Morrison's claim of wrongful sentencing because Mr. Morrison "admits that he and the Co-Defendant were present for the commission of th[e] crime." The circuit court stated:

> Attributing the hair from the scene to one of the Defendants does not impact any assignment of culpability to either of them nor does it establish [Mr. Morrison's] innocence. Allowing the testing of the hair may, at best, only prove that the Co-Defendant had contact with the Victim at the scene, which is an incontrovertible fact. There is no logical nexus between proving the presence of the Co-Defendant at the scene and a lesser culpability of [Mr. Morrison], particularly considering [Mr. Morrison's] confession detailing his presence and participation in this crime. Even if testing could determine that the source of the hair was the Co-Defendant, it would not negate the presence of both Defendants at the scene of the crime, which resulted [in Mr. Morrison's] life sentence.

---

[5]On May 30, 2024, the State filed a supplemental response to the petition for DNA testing, and on June 12, 2024, the State filed a second supplemental response.

[6]In the opinion, the circuit court found that, "[a]fter an exhaustive search, the white towel was assumed irretrievable based on a thorough review of all the evidence in storage." The circuit court stated that the hair from the scene, however, was preserved on a microscope slide, which had been located. As such, the hair, but not the towel, was the subject of the hearing in the circuit court.

Upon receipt of the circuit court's opinion and order, this Court established the equivalent of a briefing schedule which provided Mr. Morrison and the State an opportunity to respond to the circuit court's decision. On December 20, 2024, this Court issued an order directing that any response by Mr. Morrison to the circuit court's December 4, 2024 memorandum opinion and order was to be filed on or before January 22, 2025, and that the State's reply, if any, was to be filed within 30 days of the filing of Mr. Morrison's response.

On December 16, 2024, before the issuance of this Court's order, Mr. Morrison filed a notice of appeal to the Appellate Court with respect to the circuit court's December 4, 2024 opinion and order. On December 26, 2024, the Appellate Court transferred the appeal to this Court. Although the cases have not been formally consolidated, the notice of appeal filed by Mr. Morrison on December 16, 2024, has been docketed under the same case number as the instant appeal.

On December 30, 2024, Mr. Morrison filed in this Court a "Motion for Hearing," requesting a "hearing to challenge opinion and order, also to show proof of a lawyer's lack of candor and truthfulness before Carroll County Circuit Court."[7]

---

[7]In the motion, Mr. Morrison requests a hearing and appears to request other relief not involving DNA testing, by alleging that an Assistant State's Attorney who represented the State in his postconviction matter previously represented his co-defendant and "lied" to the circuit court "pertaining to the statement of facts of this case," during her representation of the co-defendant. In an order issued concurrent with this opinion, we deny the motion. This Court is able to consider the merits of the DNA appeal based on the arguments presented in the record.

On January 14, 2025, in response to this Court's order of December 20, 2024, Mr. Morrison filed *pro se* in this Court "Appellant's Ordered Response." In the response, among other things, Mr. Morrison alleged that he "did not commit First degree premeditated murder and the State has no evidence proving that [he] did." Mr. Morrison argued that the circuit court's opinion and order were incorrect, that "the evidence needs to be tested for justice[,]" and that based on the dishonesty of the "State representative,"[8] he "should be released or granted/ordered a new trial."[9]

On February 7, 2025, the State filed in this Court the "State's Reply to Petitioner's Response," contending that the circuit court did not err in denying Mr. Morrison's petition for postconviction DNA testing of the hair and that Mr. Morrison is not entitled to testing under CP § 8-201(d)(1)(i). The State argued that, "[c]onsidering [Mr.] Morrison's

---

[8]In his response, Mr. Morrison alleges:

> The State representative, as a public defender argued for Troy Shellington's reduction of sentence. During the hearing the public defender, now State representative told the Carroll County Circuit Court that "Shellington is not the individual who actually killed the woman." . . . "I believe he identified the co-defendant." Mr. Shellington's sentence was further reduced and he was quickly released (paroled). The day of Mr. Shellington's reduction of sentence[] was the public defender's last day as public defender.

(Ellipses in original).

[9]Also on January 14, 2025, Mr. Morrison filed a letter, addressed to the Chief Justice of this Court, stating that he had ordered the transcripts of the September 27, 2024 hearing conducted by the circuit court, but the transcripts would not be sent to him by the January 22, 2025 deadline. Mr. Morrison stated that he submitted his "Ordered Response" without the "9/27/24 record." There is no indication, however, that the September 27, 2024 hearing in the circuit court involved the testimony of witnesses. In its December 4, 2024 memorandum opinion, in describing the September 27, 2024 hearing, the circuit court summarized the arguments of both Mr. Morrison and the State.

admission that he participated in the murder in the very petition at issue, a DNA test of the hair will not tend to clear or tend to establish his innocence or mitigate his culpability." (Cleaned up).

On February 18, 2025, Mr. Morrison filed "Appellant's Reply to State's Reply," again arguing that a State representative had engaged in dishonesty and seeking as relief "Release, New Trial, DNA Testing, Hearing[.]"

"This Court reviews without deference the legal standard that a circuit court uses in ruling on a petition for post-conviction DNA testing." Satterfield v. State, 483 Md. 452, 463, 294 A.3d 166, 172 (2023) (cleaned up). "We review a circuit court's determination of whether a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence for clear error" and, "if there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous." Id. at 463, 294 A.3d at 172 (cleaned up).

Under the DNA testing statute, CP § 8-201, "a person who is convicted of a crime of violence" may file a petition in the circuit court seeking "DNA testing of scientific identification evidence that the State possesses that is related to the judgment of conviction[.]" CP § 8-201(b)(1). CP § 8-201(a)(5) defines "scientific identification evidence" as evidence that:

> (i) is related to an investigation or prosecution that resulted in a judgment of conviction;
>
> (ii) is in the actual or constructive possession of a law enforcement agency or agent of a law enforcement agency; and

- 10 -

(iii) contains biological evidence from which DNA may be recovered that may produce exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing.

"CP § 8-201(d) requires the court to order DNA testing if the petitioner demonstrates that two conditions are met." Givens v. State, 459 Md. 694, 707, 188 A.3d 903, 910 (2018) (citation omitted). First, the circuit court must find that "a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing[.]" CP § 8-201(d)(1)(i). Second, the circuit court must also find that "the requested DNA test employs a method of testing generally accepted within the relevant scientific community." CP § 8-201(d)(1)(ii). In Givens, 459 Md. at 707, 188 A.3d at 910, we stated that, under CP § 8-201(d), "a reasonable probability requires more than mere possibility, rather, it is a fair likelihood that something is true." (Cleaned up). As such, a "petitioner's burden to demonstrate a reasonable probability that the evidence would be exculpatory does not require establishing that the result would have been different if the DNA results sought were known at the time of trial" and "[t]he results need not exonerate the petitioner or prove that someone else committed the crime." Id. at 707-08, 188 A.3d at 910 (cleaned up). "Rather, exculpatory in CP § 8-201 means only evidence that would tend to clear the accused of guilt, or tend to establish his or her innocence." Id. at 708, 188 A.3d at 910 (cleaned up). Thus, to satisfy the burden under CP § 8-201(d), a petitioner must demonstrate that the testing sought "has the scientific potential to produce evidence that

would tend to show that [the petitioner] did not commit the crime, or that [the petitioner] is innocent." Id. at 708, 188 A.3d at 910-11.

Applying these principles, we affirm the circuit court's memorandum opinion and order of December 4, 2024, and hold that there is no reasonable probability that DNA testing of the hair at issue would produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing. In the Petition for DNA testing, Mr. Morrison appears to seek DNA testing to challenge only his sentencing, alleging that DNA testing would dispel the idea that he was more culpable than Troy Shellington, his codefendant, and that he should not have received the "enhanced" sentence of life without parole.[10] In response to the circuit court's December 4, 2024 order, however, Mr. Morrison alleges that he is not guilty of first-degree premediated murder. This Court has not been called upon to interpret whether the phrase "wrongful conviction or sentencing" as used in CP § 8-201 applies to a claim that a person was less culpable than a codefendant or should have received a lesser sentence as opposed to a claim of wrongful sentencing due to the potential of DNA testing to produce evidence that would tend to show that the person did not commit the crime, or that the person was innocent. See Givens, 459 Md. at 708, 188 A.3d at 910-

---

[10]In its memorandum opinion, the circuit court explained that "[t]he State believes that the pursuit of DNA testing by the Defendant originates from his belief that he has received an 'enhanced' sentence, and that he misunderstands how the outcomes of the Defendant and Co-Defendant differ." According to the State, on May 15, 2020, the codefendant received a modification of sentence, which the State objected to, that rendered the codefendant eligible for parole. Due in part to health concerns during the Covid pandemic, the codefendant was released from incarceration. The circuit court stated that "[t]his modification was not the result of assessing the Co-defendant's culpability or degree of participation in this crime."

11. It is not necessary, however, that we decide the issue today as it is clear that there is no reasonable probability that the DNA testing requested in this case would have produced exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing, under either interpretation.

As the circuit court concluded in its December 4, 2024 opinion and order, even if DNA testing of the hair were to demonstrate that Mr. Morrison's codefendant had contact with the victim at the scene of the crime, that would not negate or lessen Mr. Morrison's culpability, given that Mr. Morrison's confession detailed his participation as well as that of his codefendant in the crime. In other words, through Mr. Morrison's confession, and other evidence, the State established that both he and Mr. Shellington participated in planning the offense, abducting and killing the victim, and covering up the murder. Neither Mr. Morrison nor Mr. Shellington was charged or convicted of a sex offense in connection with the crime.

At the time of Mr. Morrison's sentence, a sentence of life without parole could be imposed by a judge, rather than by a jury, as a sentence for first-degree murder. See Md. Code (1957, 1992 Repl. Vol.), Art. 27, § 412(d).[11] Under Md. Code (1957, 1992 Repl. Vol.), Art. 27, § 412(d), there were no prerequisite facts regarding a defendant's degree of

_____

[11]Currently, Md. Code Ann., Crim. Law § 2-203 provides that a defendant found guilty of first-degree murder may be sentenced to life without the possibility of parole if, at least 30 days before trial, the State gave written notice of its intention to seek such a sentence, and the sentence is imposed in accordance with Md. Code Ann., Crim. Law § 2-304. Md. Code Ann., Crim. Law § 2-304(b)(1) provides that "[a] determination by a jury to impose a sentence of imprisonment for life without the possibility of parole must be unanimous."

participation in the offense that were required to be satisfied before a sentence of life without parole could be imposed.[12] Based on the facts of the case, the circuit court's determination that DNA testing lacks any reasonable probability to produce exculpatory or mitigating evidence relevant to Mr. Morrison's claim of wrongful sentencing is not clearly erroneous regardless of whether Mr. Morrison's claim is that he is less culpable than Mr. Shellington and should not have received a sentence of life without parole or that he is not guilty. Under either scenario, the circuit court's determination that there is no reasonable probability that DNA testing would produce mitigating or exculpatory evidence was not clearly erroneous.

The record reflects that Mr. Morrison made an audiotaped confession concerning the events that led to the victim's death, including, among other things, that he and his codefendant broke into the victim's house, grabbed her, tied her to a chair, held her captive for the day, then when it was dark drove the victim out to abandon her in a cornfield, where, when he and the codefendant began to leave, the victim "ran into the knife" that the codefendant was holding. Morrison, 98 Md. App. at 448-49, 633 A.2d at 897-98. Thereafter, the men dragged the victim's body back into the field, where they covered it, and then returned to the victim's house and took various items, including a television, computer, and jewelry. See id. at 449, 633 A.2d at 898. DNA testing of the hair at issue—

---

[12]Pursuant to Md. Code (1957, 1992 Repl. Vol.), Art. 27, § 412(b), the State was required to give notice to the defendant that it was seeking a sentence of life without parole. The record reflects that, on June 5, 1992, the State filed such a notice, stating that, should Mr. Morrison "be found guilty of murder in the first degree or felony murder, the State intends to seek a sentence of imprisonment for life without the possibility of parole." This case does not involve a challenge to the notice requirement.

even if it demonstrated that hair found on the victim's clothing belonged to the codefendant—has no reasonable probability to produce exculpatory or mitigating evidence, as Mr. Morrison confessed in detail about his participation in the crime, and would not tend to show that he did not commit the crime or that he is innocent.

For the reasons above, we hold that the circuit court did not err in denying the petition for postconviction DNA testing and affirm the December 4, 2024 opinion and order of the circuit court. Given that, in the notice of appeal filed on December 16, 2024, in the Appellate Court and transferred to this Court on December 26, 2024, Mr. Morrison appeals from the circuit court's December 4, 2024 opinion and order, which is the same opinion and order that is the subject of review in this case, for the same reasons, we affirm the decision of the circuit court in the appeal that was filed on December 16, 2024.

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**